Marvin Terrill CURRY, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–05–00399–CR.

Court of Appeals of Texas, Waco.

March 28, 2007.

John A. Kuchera, Waco, for appellant.

John W. Segrest, McLennan County Dist. Atty., Waco, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

A jury found Marvin Curry guilty of murder and assessed a seventy-year prison sentence. He appeals, asserting four issues in his original brief and two issues in a supplemental brief filed by his new counsel after his original attorney withdrew. We will affirm.

## Factual Sufficiency of the Evidence

Marvin's first issue complains that the evidence of guilt and the evidence supporting the jury's implied finding against self-defense is factually insufficient. His fourth issue complains that the jury's implied finding against sudden passion is factually insufficient.

In a factual sufficiency review, we ask whether a neutral review of all the evidence, though legally sufficient, demonstrates either that the proof of guilt is so weak or that conflicting evidence is so strong as to render the factfinder's verdict clearly wrong and manifestly unjust. *Watson v. State,* 204 S.W.3d 404, 414–15 (Tex. Crim.App.2006); *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). "The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact." *Johnson,* 23 S.W.3d at 7 (quoting *Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996)). The appellate court "does not indulge in inferences or confine its view to evidence favoring one side of the case. Rather, it looks at all the evidence on both sides and then makes a predominantly intuitive judgment. . . ." *Id.* (quoting William Powers and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEXAS L.REV. 515, 519 (1991)). The nature of a factual sufficiency review authorizes an appellate court, although to a very limited degree, to act as the so-called "thirteenth juror" to review the factfinder's weighing of the evidence and disagree with the factfinder's determination. *Watson,* 204 S.W.3d at 416–17.

*Self–Defense*

■ If there is a reasonable doubt with respect to the existence of a defense, the accused must be acquitted. TEX. PEN. CODE ANN. § 2.03(d) (Vernon 2003); *Winkley v. State,* 123 S.W.3d 707, 712 (Tex. App.-Austin 2004, no pet.). In other words, the trier of fact must find against the defendant on the defensive issue beyond a reasonable doubt. *See Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App. 1991). When a defendant challenges the factual sufficiency of the rejection of a defense, we must review all of the evidence in a neutral light and ask whether the State's evidence, taken alone, is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003). The State meets its burden of persuasion by proving its case beyond a reasonable doubt and thus need not produce evidence directly refuting the evidence of the defense. *Id.* at 594.

Self-defense is justified when a person "reasonably believes" that "force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." TEX. PEN.CODE ANN. § 9.31(a) (Vernon 2003). The use of deadly force is warranted only where "self-defense is justified under Section 9.31, a reasonable person would not have retreated, and when *deadly* force is reasonably necessary to protect against another's use or attempted use of *deadly* force." *Bumguardner v. State*, 963 S.W.2d 171, 173 (Tex.App.-Waco 1998, pet ref'd); *see* TEX. PEN.CODE ANN. § 9.32(a)(1)-(3) (Vernon 2003).

Marvin and Mischele Curry were married in 1997, but they had been together for about twenty years and had four children. Mischele had had several affairs, including some with men with criminal backgrounds. In October 2004, Mischele and Marvin had amicably agreed to divorce after Christmas of 2004; their older children had even been informed of the impending divorce. Also at that time, Mischele had begun seeing the victim, Dwayne Harris, an animal control officer, but Marvin was not aware of it. On the evening of October 13, 2004, Mischele and several of her children decided to go to the fair. With only one safe vehicle to drive (a GMC Yukon) and with Marvin having to go to work at 11:00 p.m., he drove them to the fair around 7:00 p.m. and they were to catch a ride home. Marvin told Mischele not to bring a man home that evening. While at the fair, Mischele called Harris, and he joined her and her children. Around 11:30 p.m., he gave them a ride home in his mini-van.

Marvin testified that after taking Mischele and the children to the fair, he was not able to rest before going to work, so he tried to reach his nephew to play a video game together. While driving around Waco that evening, Marvin noticed that his vehicle battery was losing power, so he parked it in a hospital parking lot and walked home about nine or ten blocks. He then called into work and requested and was granted vacation time for his shift that night. Around 11:00 p.m., Marvin heard his dogs barking in a way that alarmed him, so he grabbed his handgun, put it in his pocket, and went to the backyard to investigate. Marvin testified that his neighborhood had become unsafe and detailed specific violent crimes. He found no intruder, so with the gun still in his pocket, he played with his dogs for a while.

Mischele testified that as Harris was nearing the Curry home, she was worried that Marvin might see them and asked Harris to let them out a few blocks away. But Harris drove by the house to make sure that Marvin's Yukon was not there. Because it wasn't there, Harris backed up and pulled in front of the house. Mischele said the older children got out first, then she got out while holding her three-year old son. Just as Mischele closed the door, Marvin appeared from the side of the house and approached the van, whose doors were all closed and windows were all up. Marvin walked past Mischele and shot into the van from the passenger side, shattering the window (Mischele did not think that Marvin knew Harris). Harris was in the driver's seat, and Mischele had not seen a weapon with or near him in the van. She said that right before Marvin shot, Harris moved "from his left to his right." Harris's van rolled forward, hitting a truck, going through a fence, and finally resting against a neighbor's truck. Mischele said that Marvin ran alongside the van and another shot was fired;[1] Mar-

---

1. Mischele, who was still married to Marvin at the time of trial, admitted that she gave a

written statement shortly after the shooting in which she stated that Marvin "shot a couple

vin then kept going and did not return. Mischele ran to the van, saw blood coming out of Harris's mouth, and watched him take his last breath.

Their daughter Brittany Curry, age sixteen, testified that after they all got out of the van, she saw her father come around from the side of the house, walking fast toward the van, and stop and shoot Harris. She heard her mother say "no, Marvin, no." As the van then went down the street, Marvin ran after it and she heard one more shot.[2]

Waco police responded to the murder. They inventoried the van and found no weapons. Around midnight, an officer saw Marvin walking in the street in the neighborhood. The officer stopped to question Marvin, who gave a false name and date of birth. Upon checking Marvin's wallet and discovering his identity, the officer arrested Marvin. Some time later, Marvin's gun was found in a nearby front yard; he said he had thrown it there because he did not want to be shot by police for having a gun with him.

Marvin confirmed Mischele's testimony that he had told her not to bring a man home; although he apparently tolerated Mischele's affairs and was amicable with the proposed divorce, he did not want another man in his home "disrespecting" him. He said that while playing with his dogs in the back, he noticed a van pull up in front of his house and didn't know what to think, but he hurried toward the front of the house. He then saw his wife and kids get out. Mischele had a "funny" look on her face—a shocked, "you-are-home" type of look. Marvin explained what happened next:

As I was walking up on the van, I seen a figure behind the front wheel, my wife was standing up here by the sidewalk. As I was approaching the van I noticed the guy—well, he started moving around, and as I am getting closer . . . I couldn't actually see the person that was inside the van. But it was—I could, you know, see like a figure of a person inside the van. . . . I turned, you know, because I started to see the guy started to go down, if this is his vehicle, I started seeing him turn and go down like this here. . . . When I started seeing him, you know, moving around, I pulled the gun out. . . . I see the guy turn, and he started reaching down, and that's when I pulled my weapon. . . . I thought he was going for a weapon . . . [b]ecause I had just caught my wife with, you know, this guy. And I thought he was going to pull the weapon on my. . . . I pulled my firearm and I fired one time [through the passenger window]. . . . I thought my life was in danger and I thought that I was just trying to protect myself, that's all I wanted to do. I never meant to hurt this man. All I wanted to do was tell him don't come around my house. . . . I didn't know what he was going to try to do, I thought he was going to try to fire on me, so I fired first.

Marvin said he then began to run to separate himself from his family, and he noticed the van taking off. As he was running down the street, he didn't see anybody in the van, but when he saw the driver "pop up real quick," he fired one more shot and kept running because he was "deathly afraid." He thought that the driver was popping up to take a shot at him. Marvin said that after the second shot, he ran for several blocks and ended

---

of more times, I am not sure how many total." Mischele did not think that Marvin was capable of murder, and she confirmed that their neighborhood was not always safe.

**2.** Brittany agreed that their neighborhood had a lot of crime. She said that Marvin was a great father and was peaceful and law-abiding.

up in a creek for about ten minutes. On cross-examination, Marvin admitted that he had wanted to know if there was a man in the van because Marvin wanted him to respect him.

Debra Diaz, a witness, saw Marvin running and trying to keep up with the van "like he wanted to talk to the person in the car or something." She said that when Marvin caught up with the van, he went over to it and shot into the driver's window.

■ We hold that the evidence is factually sufficient to support the jury's rejection of Marvin's claim of self-defense beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 913–14. First, deadly force was unnecessary under the circumstances. No evidence indicates that Harris either possessed a weapon or attempted to use deadly force against Marvin, and the jury was free to disbelieve Marvin's testimony that Harris reached down as if to grab a weapon, especially with Mischele's testimony that all Harris did was move from his left to his right. Marvin was armed and exercised deadly force where a reasonable person in his position would have used non-deadly force, if needed. *See Kelley v. State*, 968 S.W.2d 395, 399 (Tex.App.-Tyler 1998, no pet.). A rational jury could have found that it was not reasonable for Marvin to believe that the use of deadly force was immediately necessary. *See Bumguardner*, 963 S.W.2d at 174. The jury was free to reject Marvin's claim that he thought Harris intended to cause him death or serious bodily injury. *See Saxton*, 804 S.W.2d at 913–14.

Moreover, a reasonable person would have retreated. It was Marvin who approached the van, and he offered no explanation why he didn't retreat. It was for the jury to decide whether Marvin's "failure to retreat was reasonable under the circumstances," and the jury could have concluded that a reasonable person in Marvin's situation would have retreated. *See Alvarado v. State*, 821 S.W.2d 369, 372–73 (Tex.App.-Corpus Christi 1991, no pet.). The jury was free to reject Marvin's self-defense testimony, which was contradicted in several respects by Mischele and Diaz. *See Goodman v. State*, 66 S.W.3d 283, 285 (Tex.Crim.App.2001); *Upton v. State*, 853 S.W.2d 548, 552 (Tex.Crim.App. 1993); *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App.1991). We overrule Marvin's first issue.

*Sudden Passion*

■ A defendant has the burden to prove the issue of sudden passion arising from an adequate cause at the punishment hearing by a preponderance of the evidence.[3] TEX. PEN.CODE ANN. § 19.02(d) (Vernon 2003). A sudden passion finding reduces the offense to a second-degree felony. Because Marvin's fourth issue challenges the jury's implied finding against sudden passion, we must determine whether the jury's rejection of the issue is so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. *Hernandez v. State*, 127 S.W.3d 206, 212 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd); *Bumguardner*, 963 S.W.2d at 176. Re-

---

3. The Penal Code defines adequate cause as a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PEN.CODE ANN. § 19.02(a)(1) (Vernon 2003). Sudden passion "means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). Sudden passion and self-defense are not mutually exclusive. *Latham v. State*, 2006 WL 2065334, at *7 (Tex.App.-Tyler July 26, 2006, pet. ref'd) (mem.op.) (not designated for publication) (citing *Medlock v. State*, 591 S.W.2d 485, 487 (Tex.Crim.App.1979)).

viewing again all the evidence in a neutral light, we note that Marvin's principal defensive theory was self-defense, not sudden passion. As we held above, the evidence is factually sufficient to support the implied finding against Marvin's self-defense claim, and we likewise hold that the jury's rejection of his sudden passion issue is not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Marvin's fourth issue is overruled.

## Charge Error

Marvin's first supplemental issue asserts that the trial court fundamentally erred by not including a special-issue question on sudden passion in the punishment charge. He claims that this failure violated his right to a unanimous verdict on the sudden passion issue.

The charge adequately instructed the jury on sudden passion and stated: "If you agree on a verdict, it must be by unanimous vote." It included seven verdict forms, with four including the phrase "not under the immediate influence of sudden passion," and three including "do further find that the defendant was acting under the immediate influence of sudden passion." The jury chose the second verdict form, which states:

> We, the Jury, have found the Defendant, Marvin Terrill Curry guilty of the offense of Murder, not under the immediate influence of sudden passion, assess his punishment therefor at confinement in the Texas Department of Criminal Justice, Institutional Division for a term of 70 years (seventy), and in addition

thereto we assess a fine in the amount of $ *none,* (write amount or none).

■ A jury finding on sudden passion must be unanimous. *Sanchez v. State,* 23 S.W.3d 30, 33 (Tex.Crim.App.2000) (applying TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(c)). That is, the jurors must unanimously agree that the defendant either did or did not act under the immediate influence of sudden passion arising from an adequate cause, else the trial court must declare a mistrial. *Id.; Newton v. State,* 168 S.W.3d 255, 256 (Tex.App.-Austin 2005, pet. ref'd).

■ As several cases indicate, the better practice is for the trial court to submit a preliminary sudden passion special issue.[4] *See, e.g., Barfield v. State,* 202 S.W.3d 912, 917 (Tex.App.-Texarkana 2006, pet. ref'd); *Latham v. State,* 2006 WL 2065334, at *8 (Tex.App.-Tyler July 26, 2006, pet. ref'd) (mem.op.) (not designated for publication); *Cartier v. State,* 58 S.W.3d 756, 759–60 (Tex.App.-Amarillo 2001, pet. ref'd). For example, in *Barfield,* the charge asked, "Do you, the jury, find by a preponderance of the evidence that on the occasion in question, at the time of the commission of offense for which the defendant is on trial, the defendant, Arnold Barfield, III, caused the death of Rickey Burns, while he, Arnold Barfield, III, was under the immediate influence of sudden passion arising from an adequate cause?" *Barfield,* 202 S.W.3d at 917. We would add that the superior practice would be for the trial court to submit such a preliminary sudden passion special issue with an accompanying unanimity instruction for ei-

---

4. A preliminary sudden passion issue form reads:

   Do you the Jury find by a preponderance of the evidence that the defendant caused the death of CW under the immediate influence of sudden passion arising from an adequate cause?

   The Jury will answer either, "We do" or "We do not."

   ANSWER: _____

   ELIZABETH BERRY & GEORGE GALLAGHER, 1 TEXAS CRIMINAL JURY CHARGES § 3.470 at 3–19 (2006).

ther an affirmative or a negative finding. We thus agree with Marvin that the trial court erred. *See Sanchez*, 23 S.W.3d at 34; *Newton*, 168 S.W.3d at 257.

■■■■ Because Marvin's trial counsel did not object to the trial court's failure to submit a preliminary special issue on sudden passion, Marvin must have suffered egregious harm to obtain a reversal. *See Latham*, 2006 WL 2065334, at *7 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g)). In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Id.* at 174. Errors that result in egregious harm are those that affect "the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect a defensive theory." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App.1996). Egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex.Crim. App.2002).

We conclude that Marvin did not suffer egregious harm. First, and unlike *Sanchez*, nothing in the record indicates that the jury did not unanimously find against Marvin on sudden passion. *See Sanchez*, 23 S.W.3d at 32 (noting that trial court polled jury and three jurors wanted to find for the defendant on sudden passion issue). Marvin points to two juror affidavits filed by the State in response to his motion for new trial on juror misconduct. Those affidavits indicate that juror Rodriguez initially considered that Marvin should be convicted on a lesser-included charge and that

he should receive probation. But nothing indicates that juror Rodriguez found for Marvin on the sudden passion issue, and Marvin's speculation that she might have found sudden passion is theoretical harm that we will not credit.

Next, the general instruction informed the jury that its verdict must be by a unanimous vote, and nothing else in the charge indicated to the jury that its vote against sudden passion did not have to be unanimous. Furthermore, because each of the seven verdict forms were inclusive of the sudden passion issue and we presume that the jury followed the general unanimity instruction, the jury necessarily would have unanimously voted for or against sudden passion with any of the seven verdict forms, including the one they chose and by which they assessed the seventy-year sentence.

Finally, the principal basis of Marvin's defense was not sudden passion, but was self-defense, followed by the lesser-included offenses of aggravated assault and deadly conduct. Self-defense and sudden passion are not mutually exclusive, but to the extent Marvin's sudden passion arose out of his alleged self-defense, the jury unanimously rejected that notion with its guilt finding on murder. And to the extent Marvin's sudden passion is alleged to have arisen out of catching his wife being driven home by another man, the evidence revealed that Marvin had amicably agreed to a divorce in a few months and that he had been accepting of Mischele's affairs, rather than being angered and raging. The evidence supporting sudden passion is simply too weak to be said to go the "very basis of the case" or "vitally affect a defensive theory" and thus constitute egregious harm. Because Marvin has not suffered egregious harm, we overrule his first supplemental issue.

### Ineffective Assistance of Counsel

■ Marvin's second supplemental issue is ineffective assistance of counsel for his trial counsel's failure to request a special issue on sudden passion. The standard in *Strickland v. Washington* applies to a claim of ineffective assistance of counsel. To prevail, a defendant must first show that his counsel's performance was deficient. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see Mitchell v. State,* 68 S.W.3d 640, 642 (Tex.Crim.App.2002). Then it must be shown that this deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

■ Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Mallett v. State,* 65 S.W.3d 59, 63 (Tex.Crim.App.2001); *Tong v. State,* 25 S.W.3d 707, 712 (Tex. Crim.App.2000). Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the presumption that counsel's conduct was reasonable and professional. *See Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex.Crim.App.2005). Rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation: "[i]n the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel." *Thompson v. State,* 9 S.W.3d 808, 813–14 (Tex.Crim. App.1999); *see also Mitchell,* 68 S.W.3d at 642 ("The reasonableness of counsel's choices often involves facts that do not appear in the appellate record. A petition for writ of habeas corpus usually is the appropriate vehicle to investigate ineffective-assistance claims.").

■ In the absence of evidence of trial counsel's reason for the challenged conduct, we assume a strategic reason for trial counsel's conduct, if one can be imagined. *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001) ("an appellate court 'commonly will assume a strategic motivation if any can possibly be imagined,' and will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it") (quoting 3 W. LAFAVE, ET AL., CRIMINAL PROCEDURE § 11.10(c) (2d ed.1999) and citing *Thompson,* 9 S.W.3d at 814). But, if nothing in the record reveals trial counsel's reason, it is improper for us to speculate on it. *See Thompson,* 9 S.W.3d at 814.

We have a silent record before us about why Marvin's trial counsel did not request a special issue on sudden passion, and because the law on that topic has recently been, and still is, emerging, the failure to request that special issue is not conduct that no competent attorney would have engaged in. We overrule Marvin's second supplemental issue.

### Jury Misconduct

■ Marvin's second issue complains that the trial court erred in not granting his motion for new trial, which asserted juror misconduct for juror Rodriguez's alleged failure to answer the trial court's question in voir dire about any prospective juror's direct or indirect connection with a murder case. Her father had been murdered seventeen years earlier. Marvin thus concludes that Rodriguez withheld material information that prevented him from intelligently exercising his challenges and peremptory strikes.

■ We review a trial court's denial of a motion for new trial for abuse of discretion. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App.1995). In voir dire, the trial court asked the panel, "Is there anybody on the panel who has been connected directly or indirectly with the outcome of a case where the offense was either murder, attempted murder, or capital murder?" Rodriguez did not respond; she explained at the hearing on Marvin's motion for new trial that she did not respond because she did not take it that she was "involved" in her father's murder case.

■ We will reverse a conviction when a juror withholds information if the omission is material and the defendant exercised diligence in eliciting the information. *Jones v. State*, 596 S.W.2d 134, 137 (Tex.Crim.App.1980), *overruled on other grounds by Sneed v. State*, 670 S.W.2d 262, 266 (Tex.Crim.App.1984). Defense counsel must ask specific questions designed to bring out information that might indicate a juror's inability to be impartial and truthful. *Armstrong v. State*, 897 S.W.2d 361, 364 (Tex.Crim.App.1995). A juror's failure to reveal material information is not deemed "withheld" unless defense counsel's questions triggered a juror's duty to respond in voir dire. *Id.* at 363–64.

In this case, we agree that the trial court's question did not necessarily trigger a duty to respond for Rodriquez. Her belief that she was not connected to the outcome of her father's murder case seventeen years earlier was not unreasonable or inappropriate; she did not testify at the trial, and she only attended its last part. *See id.; Salazar v. State*, 2003 WL 22455069 (Tex.App.-Corpus Christi Oct.30, 2003, no pet.) (juror's failure to disclose that her son had been shot at by defendant's uncle eleven years earlier was not material information in response to defense counsel's question whether anyone or their relative had been a victim of a violent

crime "recently"). Additionally, Marvin's counsel could have asked a more precise question—such as whether anyone or a relative or close friend had been the victim of a murder or attempted murder—that certainly would have triggered a duty to respond by Rodriguez. Because Rodriguez did not withhold material information and Marvin did not exercise due diligence in eliciting information during voir dire, the trial court did not abuse its discretion in denying Marvin's motion for new trial. We overrule Marvin's second issue.

Marvin's third issue asserts that the trial court erred in allowing two juror's affidavits filed by the State in response to his motion for new trial. The affidavits purportedly show that Rodriguez did not purposefully withhold information to enable herself to get on the jury. Because we have held that the trial court's question did not unequivocally trigger a duty to respond by Rodriguez such that the trial court did not abuse its discretion in denying the motion for new trial, any error in the admission of the affidavits would be harmless. We thus need not address the merits of issue three.

Having overruled all of Marvin's issues, we affirm the trial court's judgment.

Chief Justice GRAY, concurring.

TOM GRAY, Chief Justice, concurring.

An opinion of an intermediate appellate court is not a form book for trial court proceedings. We should not use an opinion to write rules or procedures to be used in the trial courts. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205 (Tex.2001) ("[W]e do not write rules by opinion."). This means an intermediate court of appeals really should not give suggested wording for the trial court's charge. Our task is to review what the trial court has done. The inadvisability of an appellate court suggesting language results from the

possibility of it then having to decide in a subsequent opinion some argument that it did not contemplate when suggesting the language. The pitfall is aptly demonstrated by the fact that a number of the text for pattern jury charges, drafted by scholars who have thoroughly researched and collaborated to draft charge language, have subsequently been determined to be erroneous. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 n. 4 (Tex.1989) ("The holding in this cause will require a change in PJC 71.07.").

Further, because something not done may be a "better practice," Maj. op. at 752, or that something else may be "the superior practice," *id.*, is irrelevant and has no place in this Court's opinion, in particular in its determination of error.

I find no error in the charge. And while the majority talks about better and superior practices, they do not really explain what the error was in the charge that was actually given.

Notwithstanding these distractions in the majority opinion I find no error in the judgment of this Court and concur in it. But, in doing so, I join no part of Justice Vance's opinion, in which Justice Reyna joins, which is a clear and obvious attempt to state what they think the law should be, rather than merely deciding the issue before us, which is our proper constitutionally assigned task.