**Affirmed and Memorandum Opinion filed August 14, 2012.**



**In The**

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

———————————

**NO. 14-11-00798-CR**

———————————

**CURTIS ODETTE ROBINSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Cause No. 1274263**

## MEMORANDUM OPINION

Curtis Odette Robinson was found guilty of murder and sentenced to 30 years in prison.   In two issues, he argues that the trial court erred in (a) submitting a jury charge that permitted the jury to return a non-unanimous verdict on whether he committed the murder under the immediate influence of sudden passion arising from an adequate cause, and (b) depriving appellant of his right to question the jurors about an alleged unauthorized communication with certain individuals associated with appellant.   Because appellant did not suffer egregious harm as a result of the jury charge error and waived error by failing to request an opportunity to question the jurors, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Abo Obaydah Abdel-Salam owned and operated a gas station and convenience store on the west side of Houston, Texas. On the night of August 13, 2010, Abdel-Salam and the store manager, Humberto Martinez, were at work along with several employees. At about 10:00 p.m. that night, appellant pulled up to the store with a friend, Albert Hall. Almost as soon as he went inside the store, appellant noticed a stain on his shirt and proceeded to take the shirt off and throw it away. A store employee directed appellant to a shirt rack. As appellant perused the shirt rack, Martinez saw appellant take two shirts from the rack. Appellant dropped one of the shirts and bent down to get it, but when appellant stood up, the dropped shirt was no longer visible. Martinez, suspecting theft, told appellant to put the shirt back. As appellant removed the shirt from under his waistband, Abdel-Salam approached and demanded that appellant leave the store. Although appellant offered to pay for the shirt, Abdel-Salam refused to accept payment and insisted that he leave. Appellant began cursing at Abdel-Salam, who responded by physically forcing appellant out the door and onto the pavement outside.

As appellant fell to the ground outside the store, Hall approached and confronted Martinez. Martinez turned to face Hall, at which point appellant got up and "sucker-punched" Martinez. Appellant and Hall proceeded to beat Martinez, and Martinez's fellow employees rushed to Martinez's defense. Abdel-Salam ran inside the store and returned with a cane, which he used to strike Hall. The fight continued until an unidentified man stepped in and separated the parties. Meanwhile, appellant ran back to his car. Without warning, appellant turned the car toward Abdel-Salam and sped directly at him, running him over and dragging him some distance through the parking lot. Abdel-Salam died almost instantly. Appellant left the scene with Hall; he was arrested later that night and charged with murder.

At trial, appellant took the stand in his own defense. In his version of events, appellant was falsely accused of stealing, tried to pay, and was physically thrown out of the

2

store even as he was trying to leave voluntarily. He also testified that when he got into his car, he thought he saw Martinez "trying to open up the door or something or get me back out of the car." He stated that his primary concern was that "we've got to leave, we've got to leave because I knew the police was coming." He therefore "panick[ed]" and simply "took off," running over Abdel-Salam unintentionally.

On the eve of the third day of trial, an incident occurred outside the courthouse involving several jurors and certain individuals apparently associated with appellant. When the trial court convened the next day, the trial judge announced to the State and appellant that he would question each juror about what had happened. Neither appellant nor the State objected to his arrangement or asked to conduct further questioning themselves. The first juror questioned gave the clearest account of what had taken place:

> I walked out with a couple of jurors. And some of the other jurors were already outside smoking. And there was some—I don't know who they were, but some members of—I'm assuming it's [appellant's] party, were starting to make—they weren't like screaming, but they were yelling about how we're trying to kill him and we're trying to hang him. And I guess they were calling him the "N" word.
>
> And it's just—from that moment on, everybody just wanted to stay together. And when we started to walk, they were walking in front of us and they kept turning around and making comments to us, and just, you know, looking at us like they were just angry. And when we got to the parking area, half of us were split. And some of us were in the same parking lot and they got in their vehicle and they—they sat in their vehicle until each one of us were in our vehicle and driving off. And they were just watching us. It just was uncomfortable.

According to a second juror, "there were three or four of us out there smoking. And a group walked by and said: You-all are trying to kill my n_____r brother, I can see it." Several jurors told the trial judge that they had heard about the incident but had not witnessed it themselves, while others represented that they had not heard about it at all. Each juror was asked if the incident had compromised his or her ability to be a fair and impartial juror, and each responded that it had not. Neither appellant nor the State asked

3

to question the jurors further, and the trial court reseated all of the jurors for the remainder of trial without objection.

At the conclusion of the guilt-innocence phase, the jury found appellant guilty of murder. Appellant requested that the trial court submit a jury charge on the special issue of whether he killed Abdel-Salam under the immediate influence of sudden passion arising from an adequate cause. The trial court submitted a punishment charge that included a general unanimity instruction providing that "your verdict must be by a unanimous vote of all members of the jury," and the trial court also provided a special-issue verdict form on the issue of sudden passion. That verdict form concluded with the following passage:

> Do you the Jury unanimously find by a preponderance of the evidence that the defendant caused the death of [the complainant] under the immediate influence of sudden passion arising from an adequate cause? The Jury will answer either, "We do" or "We do not."

The verdict form contained no analogous instruction requiring unanimity for a negative finding on the issue of sudden passion. Appellant did not object to the charge. The jury returned a negative finding on sudden passion and sentenced appellant to 30 years in prison.

## II. QUESTIONS PRESENTED

In two issues, appellant argues that the trial court erred in (a) submitting a jury charge that permitted the jury to return a non-unanimous verdict on the issue of sudden passion, and (b) depriving appellant of his right to question the jurors about the alleged unauthorized communications with the members of appellant's party.

## III. ANALYSIS

### 1. Jury Charge Error

Appellant first argues that the trial court erred in submitting an erroneous jury charge on the issue of sudden passion. We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)

4

(op. on reh'g).  We first determine whether error exists in the charge.  *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  If we find error in the charge, then we evaluate the degree of harm caused by the error.  *Id.*  If the appellant preserved the error in the trial court by timely objection, we will reverse if the appellant shows he suffered "some harm" resulted from the error.  *Almanza*, 686 S.W.2d at 171.  If the appellant failed to preserve error by timely objection, we will reverse only if the error resulted in "egregious harm." *Id.*

At the punishment stage of trial, a defendant convicted of murder may raise the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause.  TEX. PENAL CODE ANN. § 19.02(d) (West 2011).  If the defendant proves this issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second, rather than the first, degree.  *Id*.  "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.  *Id.*, § 19.02(a)(1).  "Sudden passion" means passion directly caused by and arising out of provocation of the individual killed or another acting with the person killed and which arises at the time of the offense and is not solely the result of earlier provocation.  *Id.*, § 19.02(a)(2).  The defendant must show that "the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide." *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).  The mere fact that someone acts in response to provocation of another is not enough.  *Trevino v. State*, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003).

The State concedes that the jury charge in this case was erroneous.  The Court of Criminal Appeals has held that when sudden passion is raised and submitted to the jury, the jury must unanimously agree that the defendant either did or did not act under the immediate influence of sudden passion arising from an adequate cause.  *Sanchez v. State*,

5

23 S.W.3d 30, 33–34 (Tex. Crim. App. 2000). In *Sanchez*, the Court of Criminal Appeals concluded that jury-charge error existed where the trial court instructed jurors that "they could find in appellant's favor on the issue of sudden passion only if they were unanimous, and that otherwise they would have to find against appellant on that issue." *Id.* at 32. The jury charge here, like that in *Sanchez*, presents the jury with two alternatives: if it unanimously finds in appellant's favor, it should answer "yes" to the sudden passion issue; if its finding is not unanimous, it should answer "no." This charge is inconsistent with the requirement of jury unanimity in any finding on sudden passion. *See also Newton v. State*, 168 S.W.3d 255, 257 (Tex. App.—Austin 2005, pet. ref'd) (concluding that instruction was erroneous where second-degree murder verdict form required unanimous finding on sudden passion, but first-degree murder verdict form did not).

Because appellant failed to object to the jury charge, however, we will reverse only if we conclude that he suffered egregious harm as a result of the charge error. *See Almanza*, 686 S.W.2d at 171. If the charge error caused the jury, in fact, to render a less-than-unanimous verdict on an issue on which unanimity is required, the charge error is egregiously harmful. *Swearingen v. State*, 270 S.W.3d 804, 812 (Tex. App.—Austin 2008, pet. ref'd) (citing *Ngo*, 175 S.W.3d at 750–52). Thus, in this case, appellant suffered egregious harm if, in fact, the jury did not unanimously find by a preponderance of the evidence that the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause. *See id.* at 812–13. The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm. *Almanza*, 686 S.W.2d at 174. Neither appellant nor the State has the burden to show egregious harm or the lack thereof. *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). In evaluating whether appellant suffered egregious harm, we are to consider (1) the entire jury charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the parties' arguments, and (4) any other relevant information revealed by the record of the trial as a whole. *Allen v. State*,

6

253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006).

We first examine the entire jury charge. In *Sanchez*, the Court of Criminal Appeals concluded that the appellant had suffered egregious harm where the jury (1) was expressly instructed that it should find against the appellant if it could not reach a unanimous finding; and (2) when asked by the trial court whether their decision was unanimous, the jurors answered it was not. *Sanchez*, 23 S.W.3d at 32. In that case, three jurors stated that they had wanted to find in the appellant's favor on the issue of sudden passion but were prevented from doing so by the trial court's instructions. *Id.* In contrasting subsequent cases with *Sanchez*, appellate courts have identified the following circumstances as lessening the likelihood that the appellant suffered egregious harm as a result of a faulty unanimity instruction on sudden passion:

- The presence of a general unanimity instruction elsewhere in the charge. *See Swearingen*, 270 S.W.3d at 813; *Bradshaw v. State*, 244 S.W.3d 490, 494–98 (Tex. App.—Texarkana 2007, pet. ref'd); *Curry v. State*, 222 S.W.3d 745, 753 (Tex. App.—Waco 2007).

- The absence of an affirmative instruction that the jury need *not* be unanimous in finding against the defendant. *Swearingen*, 270 S.W.3d at 813*; Bradshaw*, 244 S.W.3d at 497–98; *Curry*, 222 S.W.3d at 753.

- The absence of affirmative evidence that the jury actually lacked unanimity in finding against the defendant. *Swearingen*, 270 S.W.3d at 813; *Bradshaw*, 244 S.W.3d at 494–98; *Curry*, 222 S.W.3d at 753. *But see London v. State*, 325 S.W.3d 197, 208 (Tex. App.—Dallas 2008, pet. ref'd) (noting that "on appeal [in an earlier, unpublished case], we considered not whether there was any evidence the verdict was not unanimous, but whether there was any evidence that it was" and concluding that unanimous show-of-hands vote did not mitigate egregious harm because "the collective

7

response could have been the result of the jury not being unanimous in reaching an affirmative answer").

- The absence of an emphasis on the faulty instruction in the State's closing argument. *See Swearingen*, 270 S.W.3d at 814 ("In some cases involving charge error implicating jury unanimity, appellate courts have found egregious harm based in part on prosecutor statements urging the jury to make a non-unanimous finding.") (citing *Ngo*, 175 S.W.3d at 750–52 and *London*, 325 S.W.3d at 208–09); *Hines v. State*, 269 S.W.3d 209, 221–22 (Tex. App.—Texarkana 2008, pet. ref'd, untimely filed) ("The State, by twice emphasizing the very point which was in error, exponentially magnified the error contained in the charge and converted it from theoretical harm into actual harm.").

Each of these mitigating factors was present in this case. First, a general unanimity instruction was included in the jury charge for punishment. Second, the jury was not explicitly told that it need not be unanimous in finding against appellant. Third, there is no affirmative evidence in this case that the jury was not unanimous in finding against appellant. After reading the verdict, the trial court asked the jurors, "so say you all to this verdict?" to which the jurors answered "yes" in unison. Finally, the State did not even mention the unanimity requirement in its closing argument.

We next consider the evidence in the case. *Allen*, 253 S.W.3d at 264. The state of the evidence in this case does little to help appellant's argument. Unlike the appellant in *Sanchez*,[1] appellant did not call an expert at the punishment phase, nor did appellant himself testify at that time. The only evidence in support of appellant's sudden-passion argument was his own testimony during the guilt-innocence phase. Appellant gave the following testimony about his state of mind in the moments after the brawl broke up:

---

[1] *See Sanchez*, 23 S.W.3d at 32.

Q. What was your intention once that part of the fight was over?

A. To try to tell [Hall]: Let's go, let's get out on of here.

Q. What did you do?

A. I got in the car.

Q. When you got in the car, did you see anything? What else was going on in your mind?

A. When I got in the car, I was looking around to see if I could see [Hall], was he following behind me. When I looked to my left side mirror, I seen somebody walking up behind my car, like towards the back door.

Q. Did you recognize who that person was walking up?

A. I believe it was the dude that got cold-punched or something like that.

Q. One of the people that testified earlier?

A. Yes, sir.

Q. Mr. Martinez?

A. I'm not sure of his name.

Q. Okay. But you saw that person, right?

A. Yes, sir.

Q. What did you think he was doing?

A. I thought he was trying to open up the door or something or get me back out of the car.

Q. What happened next?

A. I put my car in park [sic] and I took off.

Q. What were you doing?

9

A. I was—I was really moving too fast. I was really panicking.

Q. What happened next?

A. I took off. I ran over somebody.

. . . .

Q. How come you didn't just go straight?

A. I—I don't know. I mean, I wasn't really just thinking at the time.

. . . .

Q. What was your purpose of taking off? What did you think?

A. Taking off when, like before—

Q. When you put the car in gear.

A. I put the car in gear because I didn't know what—the dude—I didn't know what he was doing, like, why he's running up on my car like that.

. . . .

Q. So, in your mind—what was going on in your heart, not your mind. What was going on in your heart?

A. My heart—my heart was—my heart was beating real fast. It was just hurting. It was like my heart was telling me to leave the store because we've got to leave, we've got to leave because I knew the police was coming. The police was going to arrive.

Q. So, what was your intent, to run over Mr. Salam?

A. No, sir. No, sir. I . . .

Q. You didn't just drive straight at him and—

A. No, sir. I had no intention of killing him.

10

. . . .

Q. Once you drove and you realized that you had gone over Mr. Salam, did you try to get out of the car?

A. Yes, sir, I wanted to get out of the car.

Q. Why didn't you get out of the car?

A. I was scared.

Q. And once people drove—I mean, did your friend get in the car at some time then?

A. Yes, sir.   Yeah, he jumped in the car.

Q. And where did you go?

A. I just—I rode up the street and I had called my cousin D.J. to check on the man for me to make sure he was still alive.

. . . .

Q. What was going on in the car between you and Al?

A. Well, I was shaking.   [Hall] was shaking.   And I was just—I was like cursing, cursing to myself.

Q. Cursing to yourself about what?

A. I couldn't believe—I didn't—I didn't—I didn't want to—I didn't want to believe what just happened happened.

This testimony identifies two causes for appellant's "panicked" state of mind: (1) fear that the police would soon arrive, and (2) fear that Martinez "was trying to open up the door or something or get [appellant] back out of the car."   As a result of his panic and the fact that he "wasn't really just thinking at the time," appellant went too fast and unintentionally hit Abdel-Salam.   His later shock, according to appellant, demonstrated his overwhelmed

11

state of mind at the time he drove at Abdel-Salam. Even taken as true, this testimony does not support a sudden-passion defense because it fails to show an "adequate cause." To support a sudden-passion defense, evidence must show both that the defendant was acting under the influence of sudden passion *and* that the passion arose out of an adequate cause. *See Merchant v. State*, 810 S.W.2d 305, 309–10 (Tex. App.—Dallas 1991, pet. ref'd). A bare claim of fear does not show adequate cause. *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983). Rather, adequate cause means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1). Appellant's fears that the police would soon arrive and that Martinez was approaching his car do not rise to the level of adequate cause for appellant to become so devoid of any sort of caution that he would plow into Abdel-Salam at full speed. Further, any "adrenaline rush" remaining after the fight broke up cannot explain appellant's rushing back to his car, starting it, and driving directly at Abdel-Salam. These are not circumstances under which a person of ordinary temper would experience such terror as to "render the mind incapable of cool reflection" so completely. The theoretical possibility that a member of the jury might have concluded otherwise is not enough to show actual, rather than theoretical, harm from the faulty charge.

Third we consider the arguments of counsel. *Allen*, 253 S.W.3d at 264. As indicated above, the State did not emphasize the improper burden in closing argument. Defense counsel only briefly mentioned the special issue, focusing instead on the range of punishment, and sought mercy from the jury given his client's age. The State argued that appellant lacked adequate cause and, that the jury should answer "we do not" to the special issue, and that the jury should sentence appellant to 50 years in prison. Considering the charge as a whole, the state of the evidence, and the arguments of the parties, we conclude that appellant did not suffer egregious harm as a result of the faulty jury charge. Because appellant failed to preserve error on the faulty charge and did not suffer egregious harm as a result of the charge, we overrule appellant's first issue.

12

## 2. Unauthorized Communication

Appellant next argues that the trial court erred in failing to allow him to question the jurors about their alleged unauthorized communication with certain individuals associated with appellant. Appellant relies on *United States v. Sylvester*, 143 F.3d 923, 933 (5th Cir. 1998), to support the proposition that an *ex parte* judicial examination of potentially influenced jurors is insufficient and that defense counsel has an absolute right to question the jurors. At the conclusion of the juror examinations, the trial court asked both appellant and the State whether they had "any objections going forward under this circumstance." Neither side raised any objection and at no point did appellant ask for the chance to question the jurors himself. As a general rule, a defendant must make a timely and specific objection to preserve error for appellate review. TEX. R. APP. P. 33.1(a). Appellant nonetheless argues that "[b]ecause the failure of the trial court to declare a mistrial violated [a]ppellant's federal and state constitutional rights to an impartial jury, the error can properly be classified as fundamental error and can be raised for the first time on appeal." To support the proposition that fundamental error can be raised for the first time on appeal, appellant cites the Court of Criminal Appeals' plurality decision in *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000). There, the trial court apologized to the venire panel for its long wait and then explained that the delay occurred because the defendant was indecisive on whether to accept a plea bargain. *Id.* at 130. The trial judge then told the venire that he would have preferred that the defendant had pled guilty. *Id.* A plurality of the Texas Court of Criminal Appeals held the trial court's comments during voir dire "tainted [the defendant's] presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection."

Appellant has failed to support his contention that the trial court's actions in this case constituted "fundamental error" as required under *Blue*. The facts of this case are very different from those in *Blue* and do not implicate the presumption of innocence. Appellant cites article 36.22 of the Texas Code of Criminal Procedure, which provides that

13

"[n]o person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." TEX. CODE CRIM. PROC. Art. 36.22 (West 2011). The primary goal of Article 36.22 is to insulate jurors from outside influence. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). From this, appellant infers that any violation of Article 36.22 is tantamount to a denial of the right to an impartial jury. Even if this is so, however, the Court of Criminal Appeals has held that

> [t]he right to a jury verdict entirely untainted by any potential outside influence strikes us as properly categorized among the "[a]ll but the most fundamental rights [that] are thought to be forfeited if not insisted upon by the party to whom they belong." We perceive no reason that a defendant should not be deemed to have forfeited [this right] in the event that he becomes aware of its breach during the course of the trial but fails to call the transgression to the trial court's attention so that the error may be rectified or, barring that, so that the defendant can make a timely record for appeal.

*Trinidad v. State*, 312 S.W.3d 23, 29 (Tex. Crim. App. 2010). Because appellant failed to object to the trial court's actions or request the opportunity to question the jurors about the alleged unauthorized communication, we conclude that appellant has waived error on this issue. We overrule appellant's second issue.

## IV. CONCLUSION

Having overruled appellant's two points of error, we affirm the trial court's judgment.

/s/    Tracy Christopher
Justice

Panel consists of Justices Boyce, Jamison, and Christopher.

Do Not Publish — TEX. R. APP. P. 47.2(b).

14