# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-07-00556-CR

**Tye Van Swearingen, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 60607, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

### O P I N I O N

A jury convicted Tye Van Swearingen of murdering his wife, Stephanie. *See* Tex. Penal Code Ann. § 19.02(b) (West 2003). During the punishment phase of trial, Swearingen raised the mitigating circumstance of "sudden passion." *See id*. § 19.02(a), (c) & (d). The district court submitted the issue to the jury in the form of an instruction to assess punishment at between two and twenty years imprisonment (the range applicable to second-degree felonies) if "you find by a preponderance of the evidence that the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause." Otherwise, the jury was to assess punishment at between five and ninety-nine years' imprisonment (the first-degree felony range). The court submitted a verdict form that did not contain any specific reference to the jury's preliminary sudden

passion finding, but merely required the jury to indicate the punishment it assessed. The jury imposed a sentence of 65 years' imprisonment, and the district court rendered judgment accordingly.

Swearingen brings two issues in which he seeks a new trial on punishment based on claimed error in the district court's sudden passion submission. In his first issue, Swearingen contends that the district court erred in refusing to submit a verdict form in which the jury would separately or specifically indicate its acceptance or rejection of the sudden passion issue. In his second issue, Swearingen complains that the charge as submitted required the jury to be unanimous in making any affirmative finding of sudden passion, but did not also require unanimity in any negative finding. As we explain below, we agree that the charge was erroneous in failing to require unanimity in any negative sudden passion finding, but do not find harm requiring reversal. Consequently, we will affirm the judgment.

**BACKGROUND**

Because Swearingen does not challenge his murder conviction or the sufficiency of the evidence supporting the jury's punishment verdict, we will address the underlying facts only to the extent they bear upon our harm analysis, below. Of immediate relevance to Swearingen's complaints of charge error, the penal code provides that murder is a first-degree felony unless, during the punishment phase of trial, "the defendant proves . . . in the affirmative by a preponderance of the evidence" that he "caused the death under the immediate influence of sudden passion arising from an adequate cause," in which case the offense is a second-degree felony. *See id*. § 19.02(c) & (d); *see also id*. § 19.02(a) (defining "sudden passion" and "adequate cause"). The district court included

2

an instruction on sudden passion in its charge on punishment. Following appropriate abstract instructions, the application paragraphs stated:

> If you find by a preponderance of the evidence that the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause, you will assess the defendant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for any term not more than 20 years or less than 2 years. In addition, a fine not to exceed $10,000 may be imposed.[1]
>
> However, if you do not find by a preponderance of the evidence that the defendant committed the offense of murder under the immediate influence of sudden passion arising from an adequate cause, you will assess the defendant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for Life or for any term not more than 99 years or less than 5 years. In addition, a fine not to exceed $10,000 may be imposed.[2]

The jury was given a verdict form in which it was to indicate Swearingen's term of incarceration and the amount of any fine. Although the above instructions required the jury to make a preliminary finding as to whether Swearingen had acted under the influence of sudden passion in order to determine the applicable punishment range, the district court did not submit a separate verdict form on the sudden passion issue or one in which the jury otherwise could specifically indicate its finding on that issue. Instead, the jury's sudden passion finding (or failure-to-find) was to be subsumed or implied within the jury's verdict imposing Swearingen's sentence.

In the paragraph immediately following its sudden passion instruction, the district court further instructed the jury that "[i]n arriving at your unanimous verdict, it will not be proper

---

[1] This is the punishment range for second-degree felonies. *See* Tex. Penal Code Ann. § 12.32 (West 2003).

[2] The punishment range for first-degree felonies. *See id*. § 12.33 (West 2003).

3

to fix the same by lot, chance or any other method than by a full, fair and free exercise of the opinion of the individual jurors under the evidence admitted before you."

The jury imposed a sentence within the first-degree felony range—65 years' imprisonment—consistent with a failure to find sudden passion. The district court had also instructed the jury that it could recommend probation if it assessed not more than ten years' imprisonment and found that Swearingen had no prior felony convictions. In a separate verdict form, the jury found that Swearingen had no prior felony convictions but, consistent with the sentence it assessed, declined to recommend probation. The district court rendered judgment on the verdicts.

**STANDARD OF REVIEW**

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, we then evaluate the harm caused by the error. *Id*. The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171. By contrast, unobjected-to charge error requires reversal only if it resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

## ANALYSIS

**Specific verdict form**

Swearingen acknowledges that "the issue of Sudden Passion was submitted" through the district court's instruction conditioning the applicable punishment range on the jury's preliminary finding of whether "by a preponderance of the evidence . . . the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause." The jury was instructed that if it found in the affirmative, it was to assess punishment within the second-degree felony punishment range. Conversely, the jury was instructed that "if you do not find by a preponderance of the evidence that the defendant committed the offense of murder under the immediate influence of sudden passion arising from an adequate cause," it was to assess punishment in the first-degree felony punishment range. We presume, absent evidence to the contrary, that the jury followed these instructions and that the 65-year sentence it imposed therefore reflects that the jury did "not find" in Swearingen's favor on the sudden passion issue. *Thrift v. State*, 176 S.W.3d 221, 224 & n.10 (Tex. Crim. App. 2005).

As we explain below, the charge's conditioning of the first-degree felony punishment range on the jury's *failure to find* unanimously Swearingen *did* act under sudden passion, as opposed to a unanimous jury finding that Swearingen *did not* act under sudden passion, was error—the focus of Swearingen's second issue. In his first issue, however, Swearingen contends—tracking his sole specific objection to the punishment charge at trial[3]—only that the district court erred in failing to submit the sudden passion issue through a verdict form that separately or otherwise "allow[ed] the

---

[3] *See infra* at p. 11.

5

jury to specifically demonstrate its acceptance or rejection of that issue." His complaint, in other words, is that the jury's sudden-passion finding was subsumed within a broad-form or general verdict on punishment rather than explicitly reflected in the verdict form. We cannot conclude that this form of submission, in itself, was error.

Swearingen emphasizes appellate cases illustrating that some Texas trial courts have submitted the sudden passion issue through a separate verdict form requiring a specific "yes" or "no" finding on that issue alone, *see Barfield v. State*, 202 S.W.3d 912, 917 (Tex. App.—Texarkana 2006, pet. ref'd), or through alternative verdict forms that incorporate explicit findings on the issue. *See Newton v. State*, 168 S.W.3d 255, 258 (Tex. App.—Austin 2005, pet. ref'd).[4] In fact, *Barfield*, like several other appellate cases, also recognize that a separate yes-or-no sudden passion verdict form, combined with a general instruction that the jury's verdict must be unanimous, is sufficient to ensure that the jury's sudden passion finding is unanimous. *Barfield*, 202 S.W.3d at 917-18; *see Latham v. State*, No. 12-05-00146-CR, 2006 Tex. App. LEXIS 6521, at *21 (Tex. App.—Tyler July 26, 2006, pet. ref'd) (mem. op., not designated for publication); *Cartier v. State*, 58 S.W.3d 756, 759-60 (Tex. App.—Amarillo 2001, pet. ref'd); *see also Bradshaw v. State*, 244 S.W.3d 490, 497 (Tex. App.—Texarkana 2007, pet. ref'd) (suggesting that separate verdict form on sudden passion could have prevented unanimity problem with jury instructions similar to those here). However,

---

[4] In *Newton*, as Swearingen points out, the trial court submitted four alternative punishment verdict forms that reflected findings of (1) guilty of murder with a sudden passion finding, (2) guilty of murder with a sudden passion finding, with probation, (3) guilty of murder without probation, and (4) guilty of murder with probation. *Newton v. State*, 168 S.W.3d 255, 257 (Tex. App.—Austin 2005, pet. ref'd).

6

only a single court—a divided Waco Court of Appeals—has held that the sudden passion issue *must* be submitted through a separate verdict form, or in any particular form.

In *Curry v. State*, the trial court, as the Waco court noted, "adequately instructed the jury on sudden passion" and submitted seven alternative verdict forms, four of which contained an explicit finding "not under the influence of sudden passion," and the three others containing a finding "that the defendant was acting under the influence of sudden passion." 222 S.W.3d 745, 752 (Tex. App.—Waco 2007, pet. ref'd). The charge also contained a general unanimity instruction. *Id*. The jury chose one of the verdict forms containing a finding of "not under the influence of sudden passion" and imposed a sentence of seventy years' imprisonment for murder. *Id*. The defendant argued that the trial court erred in failing to submit a specific question on sudden passion and that the error deprived him of a unanimous verdict. The *Curry* majority agreed the charge was erroneous.

The *Curry* majority reasoned that, "[a]s several cases indicate, the better practice is for the trial court to submit a preliminary sudden passion special issue." *Id*. In support for this "better practice," the majority referred to *Barfield*, *Cartier*, and *Latham*—which, as noted above, merely recognized that a separate sudden passion verdict form, combined with a general unanimity instruction, is sufficient to ensure a unanimous sudden passion finding, but did not hold that form of submission was necessarily required. The majority then stated, "We would add that the superior practice would be for the trial court to submit such a preliminary sudden passion special issue with an accompanying unanimity instruction for either an affirmative or negative finding." *Id*. at 252-53. On this basis, it "agree[d] with [the defendant] that the trial court erred." *Id*. at 253.

7

Nonetheless, the *Curry* majority affirmed the judgment of conviction, finding that the defendant, who had not objected to the trial court's failure to submit a separate sudden passion special issue, had not suffered egregious harm by actually being deprived of unanimity in the jury's adverse sudden passion finding. *See id*. It reasoned in part that "because each of the seven verdict forms were inclusive of the sudden passion issue and we presume that the jury followed the general unanimity instruction, the jury necessarily would have unanimously voted for or against sudden passion with any of the seven verdict forms, including the one they chose and by which they assessed the seventy-year sentence." *Id*. Although concurring in the judgment, Chief Justice Gray urged that there was "no error in the charge" in the first place and questioned whether the majority, in its discussion of "better and superior practices," had "really explain[ed] what the error was in the charge that was actually given." *Id*. at 755-56 (Gray, C.J., concurring).

Although *Curry* seems to hold that a trial court errs in failing to submit sudden passion through a separate preliminary question, Swearingen cites it for the more limited proposition that a trial court errs in failing to submit a verdict form—whether a separate question or an alternative verdict form—in which the jury makes an explicit sudden passion finding. We respectfully disagree with either view. Other than *Curry*, we find no support for the notion that an otherwise-proper charge containing substantively correct instructions regarding sudden passion and proper unanimity instructions is nonetheless erroneous solely because the issue is not submitted through a separate question or specific verdict form. Though it has required special verdicts on certain other issues in criminal cases, the legislature has not prescribed any particular form in which sudden passion must be submitted. *See Cartier*, 58 S.W.3d at 758 (observing that section 19.02 of

8

penal code "does not prescribe the form or manner of accompanying instructions for the submission of the issue of sudden passion."); *cf.* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b) (West 2006).[5] Nor has the court of criminal appeals. *See, e.g.*, *Mims v. State*, 3 S.W.3d 923, 928 (Tex. Crim. App. 1999) (holding only that "if raised by the evidence, the sudden passion issue should be submitted in the punishment phase of an attempted murder prosecution."). No other court of appeals has done so, either. Furthermore, as *Curry* itself recognizes, trial courts may, through proper instructions, ensure that the jury makes the required unanimous finding on sudden passion, based on the correct substantive law, regardless of the form in which the issue is submitted. We are to presume that jurors follow such instructions absent evidence to the contrary. *Thrift*, 176 S.W.3d at 224 & n.10; *Curry*, 222 S.W.3d at 253.

There may be good reasons for trial courts to submit sudden passion in the manner Swearingen advocates, in terms of helping ensure jury unanimity, *Barfield*, 202 S.W.3d at 917-18, and facilitating appellate review. *Cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388-89 (Tex. 2000) (discussing limitations on broad-form submission in civil cases). However, we cannot conclude that the district court's refusal to submit sudden passion in such a form was, in itself, error. Accordingly, we overrule Swearingen's first issue.

---

[5] For example, in article 37.071, which governs proceedings in capital cases, the legislature has required that the trial court submit jury issues on future dangerousness and "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b) (West 2006). It has further mandated that "the jury shall return a special verdict of 'yes' or 'no' on each issue submitted under Subsection (b) of this Article." *Id*. art. 37.071, § 2(c).

**Jury unanimity**

On the other hand, Swearingen's jury-unanimity complaint in his second issue has merit. The court of criminal appeals has held that when sudden passion is raised and submitted, the jury must unanimously agree that the defendant either did *or did not* act under the immediate influence of sudden passion arising from an adequate cause. *Sanchez v. State*, 23 S.W.3d 30, 33-34 (Tex. Crim. App. 2000); *Newton*, 168 S.W.3d at 256. This requirement derives in part from the statutory requirement that the jury "agree" unanimously as to both "the guilt or innocence of the defendant and the amount of punishment." *Sanchez*, 23 S.W.3d at 33-34 (quoting Tex. Code Crim. Proc. Ann. art. 37.07, § 3(c)). Here, the jury was instructed to assess the second-degree felony range of punishment if it found "by a preponderance of the evidence that [Swearingen] caused the death under the immediate influence of sudden passion arising from an adequate cause." This instruction, combined with the charge's general unanimity instruction, ensured that any affirmative finding on sudden passion would be unanimous. However, the charge did not similarly require a unanimous finding that Swearingen did *not* act under the immediate influence of sudden passion arising from adequate cause. Instead, the jury was instructed to assess punishment in the first-degree felony range "if you *do not find* by a preponderance of the evidence that the defendant committed the offense of murder under the immediate influence of sudden passion arising from an adequate cause." (Emphasis added). In other words, the jury was authorized to impose the first-degree felony punishment range as a default if it *failed to find unanimously* that Swearingen *did* act under sudden passion.

It is true that, because the burden of proof on sudden passion remains with the defendant, an individual juror's *failure to find* the defendant *did* act under the influence of sudden passion functions as a finding that the defendant did *not* act under the influence of sudden passion. However, the jury's *collective* failure to find *unanimously* that the defendant acted under sudden passion does not necessarily equal a unanimous collective finding that the defendant did not act under sudden passion. The jury collectively would have failed to find unanimously that Swearingen acted under sudden passion if, for example, only one juror had voted that Swearingen did not. Because the charge conditioned the first-degree felony punishment range on only a failure to find sudden passion unanimously rather than a unanimous negative finding on the issue, the charge was erroneous. *See Sanchez*, 23 S.W.3d at 34; *Bradshaw*, 244 S.W.3d at 494-97; *Newton*, 168 S.W.3d at 256-58.

Having found charge error, we next determine the degree of harm required to reverse. The degree of harm required for reversal turns on whether Swearingen preserved a jury-unanimity objection at trial. *See Almanza*, 686 S.W.2d at 171. During the charge conference, Swearingen objected to the charge on the basis that it omitted a separate verdict form on sudden passion:

> The verdict form is lacking in regards to the sudden passion issue. It is defined and described within the contents of the charge itself and in the verdict form it is absent and in its absence even try to argue around it it's very confusing to the jury unless it's specifically there.

The district court overruled this objection, observing that the charge "raises the sudden passion [issue] and gives the definitions and tells the jury what the punishment range is and explains that and so I think it's sufficient." Swearingen made no further objections to the charge. On appeal, he

11

acknowledges that he "did not specifically object" that the charge failed to properly instruct the jury regarding unanimity on the sudden passion issue. However, he "takes the position that the failure of the trial court to present a proper verdict form to the jury (see Issue One above) prevented Appellant from requesting a unanimous finding" and that "because the trial court denied the request for a proper verdict form for the jury to affirmatively find, or not find, sudden passion[,] no objection to lack of unanimity should be required." We disagree that the district court's refusal to submit a separate verdict form on sudden passion somehow "prevented" or excused Swearingen from raising jury-unanimity objections to the charge as submitted. Nor can we conclude, especially in light of our analysis of Swearingen's first issue, that Swearingen's objection concerning the absence of a sudden passion special verdict form was sufficient to alert the district court to the unanimity problem with its instruction. *See Pennington v. State*, 697 S.W.2d 387, 390 (Tex. Crim. App. 1985) ("[A]s a predicate for complaint to a jury charge on appeal the accused is required to distinctly specify each ground of objection. To constitute a valid objection to jury instructions, the objection must be specific and clear enough to apprise the trial court of the nature of the objection."); *see also* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007) (requiring that defendant "distinctly specify[] each ground of objection" to charge). We hold that Swearingen failed to raise his jury-unanimity objection at trial. Consequently, we will reverse only if we find the charge error caused Swearingen "egregious harm." *See Almanza*, 686 S.W.2d at 171.

"Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). If the charge error caused the jury, in fact, to render

12

a less-than-unanimous verdict on an issue on which unanimity is required, the charge error is egregiously harmful. *See Ngo*, 175 S.W.3d at 750-52. In terms of the charge here, Swearingen would be egregiously harmed if, in fact, the jury assessed punishment in the first-degree felony range based on anything less than twelve jurors failing to find "by a preponderance of the evidence that the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause."

The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm. *Almanza*, 686 S.W.2d at 174. It is a "difficult standard." *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). Our inquiry is factual in nature and turns on the unique circumstances of this case. *See id*. Neither Swearingen nor the State has the burden to show harm or the lack thereof. *See Warner*, 245 S.W.3d at 464. Rather, an appellate court "makes its own assessment" in evaluating what effect, if any, an error had on the jury's verdict by looking "only to the record before it." *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000). We are to consider (1) the entire jury charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the parties' arguments, and (4) any other relevant information revealed by the record of the trial as a whole. *Allen*, 253 S.W.3d at 264; *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006).

In some cases, appellate courts are able to evaluate the impact of charge error on jury unanimity through direct evidence, such as a trial court's poll of the individual jurors. *See Sanchez*, 23 S.W.3d at 32 (jury poll revealed that three jurors voted in the affirmative); *see also Newton*, 168 S.W.3d at 259 (while applying "some harm" standard to preserved unanimity error in sudden

13

passion submission, observing that "the jury poll is the key to determining whether the charge error was harmless."). However, no jury poll was requested here, nor was there any other evidence presented regarding the votes of individual jurors. Consequently, we must infer from the record whether less than twelve jurors found against Swearingen on the preliminary sudden passion issue. *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) ("[W]e do not require direct evidence of harm to establish egregious harm.").

We begin with the text of the charge. Although the charge permitted the jury to impose the first-degree felony punishment range based on a mere failure to find sudden passion unanimously, it did not affirmatively direct the jury *not* to be unanimous in failing to find sudden passion, or even emphasize that it could be. *Cf. Sanchez*, 23 S.W.3d at 33 (charge "instructed the jurors that they could find in appellant's favor on the issue of sudden passion only if they were unanimous, and that otherwise they would have to find against appellant" on yes-no sudden passion special issue). In fact, the charge's sudden passion instruction, in combination with its general unanimity instruction, was arguably susceptible to a lay jury's interpretation that it was required to be unanimous in "not find[ing] by a preponderance of the evidence that the defendant committed the offense of murder under the immediate influence of sudden passion arising from an adequate cause." At a minimum, we can conclude that the charge did not preclude or affirmatively discourage a unanimous finding that Swearingen did not act under sudden passion. *See Bradshaw*, 244 S.W.3d at 498 (no egregious harm from similar sudden passion instruction where charge included a general unanimity instruction and "the record contains no evidence that the jury's verdict was not unanimous.").

14

Nor did the parties' arguments or other statements at trial encourage the jury to impose the first-degree felony punishment range based on a non-unanimous failure-to-find sudden passion. In some cases involving charge error implicating jury unanimity, appellate courts have found egregious harm based in part on prosecutor statements urging the jury to make a non-unanimous finding. *See Ngo*, 175 S.W.3d at 750-52 (prosecutor repeatedly emphasized that jury need not be unanimous in selecting among multiple offense submitted in the disjunctive); *London v. State*, No. 05-07-00983-CR, ___ S.W.3d ____, ___, 2008 Tex. App. LEXIS 6995, at *23-24 (Tex. App.—Dallas Sept. 22, 2008, no pet. h.) (in closing argument, prosecutor emphasized, with regard to separate sudden passion verdict form, that "[i]f one of you say, no, then your answer is no"). However, nothing of this sort occurred here. Neither party mentioned the unanimity requirement with regard to sudden passion until the State's rebuttal closing argument in the punishment phase of trial. In the context of a vigorous attack on the probative value of Swearingen's evidence regarding sudden passion, the State briefly alluded to the unanimity requirement:

> In order to decide the issue of sudden passion, all 12 of you have to agree. It has to be unanimous that this defendant acted in sudden passion and the facts do not support it.

The State then continued its argument, focusing on why the "facts do not support" Swearingen's sudden passion theory.

The first sentence of this statement is a correct shorthand description of the requirement that the jury's finding on sudden passion must be unanimous. The second sentence is a correct description of one-half of this requirement—the jury must be unanimous in any affirmative

finding on sudden passion—but omits mention that a negative finding must also be unanimous. The State's failure to fully describe the unanimity requirement, while making only a passing reference in the context on an argument focused on the merits of Swearingen's sudden passion theory, falls short of the sorts of affirmative entreaties encouraging juries not to render a unanimous verdict present in cases like *Ngo* and *London*. *Cf. Ngo*, 175 S.W.3d at 750-51; *London*, ___ S.W.3d at ___; 2008 Tex. App. LEXIS 6885, at *23-24. In short, this is not a case where a prosecutor's misstatements regarding jury unanimity "emphasiz[ed] the very point which was in error [and] exponentially magnified the error contained in the charge and converted it from theoretical harm to actual harm." *Hines v. State*, No. 06-08-00004-CR, 2008 Tex. App. LEXIS 8036, at *33, ___ S.W.3d ___, ___ (Tex. App.—Texarkana Oct. 23, 2008, no pet. h.).

Nor, in this context, can we infer egregious harm from the evidence at trial. During the guilt-innocence phase of trial, the central evidence of Swearingen's guilt was a detailed written confession given by Swearingen on Wednesday, October 18, 2006, approximately four days after he killed Stephanie. Swearingen recounted that around 5 p.m. on the preceding Saturday, as Stephanie was preparing to go out that evening to a party with a female friend, the couple had a heated argument in which Stephanie had been hitting and scratching him. Eventually,

> I attacked her [Stephanie]. I threw her on the floor and I choked her. . . . I was on top [of] her. I don't remember if I was sitting on top of her. She was still trying to fight me and hit me. I grabbed tighter around her neck. After that I was not sure if she was dead or not. I freaked out. She was like a bluish color and she had a little bit of blood coming from her nose. She still had water in the bathtub [from taking a shower, referenced earlier in his statement]. I picked her up and threw her in there. I don't know why I did that.

16

Then, Swearingen continued, he "walked into the living room to pick up" the couple's two-year old daughter, who "was crying." He then called his mother, who lived in Missouri, "told her that she needed to come and get [the daughter]" and confided that he had killed Stephanie. Thereafter, Swearingen admitted, he moved Stephanie's car from the driveway outside their house into the garage, concealing it. Later, when the friend of Stephanie's who was to accompany her to the party came by, Swearingen told her that Stephanie had already left to go to the party. Swearingen then "finished [preparing] dinner for [his daughter] and put her asleep around 8:00 p.m." With the child in bed,

> I took her body out of the bathtub and put it in the trunk of her car. I put a red handle flat tip shovel in the trunk with her. I put in the clothes that she was supposed to wear to the party. I put a[] trash bag over her face so the water would not drip all over the floor. I put a blanket down in the trunk so that the blood would not get in the trunk. Her purse and wallet were already in the vehicle in the front. I then went to bed. I went to bed late.

The following day, Swearingen continued, his mother arrived, and he drove Stephanie's car from the couple's Killeen home and left it in a parking lot in Copperas Cove, in neighboring Coryell County. That afternoon, Swearingen falsely reported his wife missing to Killeen police; he later gave an initial statement in which he admitted the couple had an argument, but claimed that Stephanie had stormed out of the house and never returned. Later that evening, Swearingen drove his truck to Copperas Cove, retrieved Stephanie's vehicle, and drove it to a cemetery south of Killeen, where he dug into one of the previously-occupied gravesites and buried Stephanie on top of the casket inside. He discarded the shovel in a creek near Nolanville and, with his mother's boyfriend following in Swearingen's truck (which evidently had been retrieved from Copperas

17

Cove), drove Stephanie's car to Waco, where Swearingen abandoned it in "some neighborhood." Swearingen then rode back to Killeen with his mother's boyfriend.

The jury also heard evidence that an autopsy identified the cause of Stephanie's death as homicide but could not determine a precise means or time of death—strangulation, drowning in the bathtub, the effects of Swearingen's leaving her in a car trunk with a trash bag over her head, or some combination of these acts—due to decomposition. Swearingen did not testify or present any other evidence during the guilt-innocence phase; his trial counsel argued only that the State had not met its burden of proving that he had intentionally or knowingly caused Stephanie's death. The district court submitted to the jury a single count of murder with three alternative theories as to how Swearingen intentionally or knowingly caused Stephanie's death: (1) "by squeezing the neck of the said Stephanie Swearingen with the defendant's hand"; (2) "by placing the head of Stephanie Swearingen under water"; or (3) "by manner and means unknown to the grand jury." After barely one hour of deliberations, the jury rendered its verdict of guilty.

During the punishment phase, Swearingen relied solely on a sudden passion theory—in essence, that the continued, combined effects of numerous stresses on himself and the couple's marriage contributed to his losing control during a heated argument and killing Stephanie. Swearingen testified, and several other witnesses confirmed, that he and Stephanie had a volatile, deeply troubled marriage characterized by frequent arguments in which she often became violent with him. The couple had married in October 2001, when Stephanie was nineteen. Following his wedding date, Swearingen, then a U.S. Army staff sergeant, was deployed to Korea for twenty-one months. The couple separated following his Korea deployment, but reunited and conceived

18

their daughter. While Stephanie was expecting, Swearingen was deployed to Iraq for eleven months ending in February 2005. Their daughter was born during this deployment. At the time of Stephanie's murder, Swearingen was within approximately two-and-a-half weeks of leaving for a second deployment to Iraq. As the deployment approached, Stephanie, according to Swearingen, had been insisting that he designate her as the sole beneficiary on his life insurance policy, to the exclusion of his son from a prior relationship.

In January 2006, Stephanie was arrested on domestic violence charges stemming from one of their arguments. The couple thereafter went through an eight-hour anger-management course and six weeks of marital counseling provided by the Army for persons returning from overseas duty. However, by the end of September 2006, the couple had resolved to divorce. The jury heard evidence of tension between the pair regarding custody or control of their daughter.

The jury also heard evidence of marital infidelity by both Stephanie and Swearingen. Although there was evidence that Swearingen knew several months before the murder that Stephanie had previously cheated on him or was aware of this history "in general," he insisted that he had been unaware that her cheating was still ongoing until she revealed it to him on the evening before her death.

In his statement, Swearingen described the circumstances leading up to the murder:

> On Friday 10-13-06 at about 3:00 p.m. I got home from work. Around 4:45 p.m., she and I started talking about custody and divorce. She stated that she was willing to stay in the area so that I could be around [the daughter]. Around 5:00 p.m. my wife and I started arguing. We argued off an[d] on for several hours. We argued about my life insurance policy. She believed that she should have it all if something happened to me. She did not think I should [sic] so much to my son. After about an hour of that, we started arguing about her infidelity. That is when she told me that she had

19

been messing around on me. She told me that she had been seeing this guy for about three months. She did not give me his name or anything about him. She just told me that she talks to him on the computer and that she had slept with him. Hearing that, I grabbed [a] cigar and left the house.

Swearingen proceeded to a Killeen bar where, he wrote, he "drank coke and smoked a cigar." He returned home around 10:30 or 11:00 and found that he was locked out of the house. Swearingen "knocked on the door and rang the door bell." "After about 5-10 minutes," Stephanie opened the door and let Swearingen inside. They resumed arguing, and Stephanie eventually "slammed the door to the bedroom" and locked it. Then, Swearingen stated, "I knocked the door open and told her not to lock me out of my house again." Swearingen left and spent the night at his cousin's house.

The following afternoon, Swearingen continued, he returned to the house and he and Stephanie resumed arguing, this time about Swearingen "going to see my son in Illinois." Their daughter woke up, and she and Stephanie took a shower together. Swearingen testified that he or Stephanie would shower while their daughter played with bath toys in the tub. He recounted that the tub was still half-full with water when he later "threw" Stephanie in there. After Stephanie got out of the shower, the couple began arguing again.

After about 5:00 p.m., she started doing her hair and getting ready for the party. I asked her how long she was going to be at the party and she said that she did not know. Afterwards, we argued more about me going to Illinois. She told me that I did not need to see my son and that I had just seen him and that the only reason I wanted to go was to see my ex. I asked her why did it matter anyway and she did not want to be with me and she had made that point known. She told me that I was stupid and that I knew nothing. Then she said to me, "where do you think I go when I say that I am going out?" After that I picked up [their daughter] and took her out of the room. When I returned to the room, she was arguing with me more and typing on her

20

computer. She told me that when I return from Iraq, she was going to sell all of my stuff. She said that I would never see my daughter and my daughter would hate me. She walked back into the bathroom. I pushed pause on her I-Tunes on her computer and closed the lid on her laptop. I then asked her how many times she had cheated on me and she told me that she did not know. I asked her if it had been since January and she told me that it basically never stopped. I asked her if she cheated on me and then came back and slept with me and she said no but how does his cum taste.

After some similarly graphic exchanges, Stephanie, according to Swearingen, clarified that she was referring to having performed oral sex on the other man; asked Swearingen again, "How does his cum taste?"; and then spit on him. Then, Swearingen claimed:

I took her laptop and disconnected the power cord. I took it into the office. When I returned to the bedroom, she threw her phone at me and said here control me. At that point, I set the phone on the bed. My daughter had walked back into the room. I picked up my daughter and I picked up the phone. She demanded that I give her the phone back. I snapped the phone in half and laid it on the nightstand.[6] After that she attacked me by scratching me and slapping me. I told her to stop and I pushed her back. I told her to get out of the house. She attacked me again in the same manner, this time scratching my face. She tried yanking my daughter out of my arms. My daughter started crying. After that I sat my daughter down and I attacked her.

After this, Swearingen continued with his description, quoted above, of how he strangled Stephanie, "threw her" into the bathtub, and later disposed of her.

During his testimony, Swearingen elaborated on the events described in his written statement. Swearingen claimed that Stephanie had made him "extremely angry" during their argument and that he did not realize, while he was attacking her, that his hands had wound up around her neck. Swearingen added that, when he realized what he had done to Stephanie, he "was

_____

[6] The broken "phone" was admitted into evidence. It was a folding cellular telephone.

terrified." Swearingen testified, "At that point I saw that my wife was not breathing and I noticed that there was blood from her nose and I knew that she was dead, sir." When asked why he put Stephanie in the bathtub, Swearingen answered, "I was scared. I saw the blood and I knew that it was going to get on the carpet and I didn't know what to do, sir. I—I don't know."

On cross-examination, the State highlighted the passage of time and Swearingen's deliberative acts between the events that supposedly caused him to lose control and when he attacked Stephanie:

Q:    When you took that computer and threw it in the room was it connected . . . to the wall with the power cord?

A:    I had disconnected the power cord as it states in my statement before I threw it from the room.

Q:    So that took time, right?

A:    It takes very little time to unplug a computer, ma'am.

Q:    So you would agree it takes some time?

A:    Maybe a second.

Q:    Okay. And you'll agree that it takes time to walk into the other room and take the computer in the other room?

A:    Yes, ma'am.

Q:    But it's your testimony that you were extremely enraged at that time?

A:    Yes, I was angry at that time.

Q:    Okay. So then you came back into the room and that's when she threw her phone at you?

A:    Yes, ma'am.

Q:     And you disabled her phone at that point so that she wasn't able to call for help?

A:     No, I believe my statement says, ma'am, that I threw it on the bed. Correct?

Q:     Then you picked it up and broke it in half, correct?

A:     Yes, I did, ma'am.

Q:     So how much time elapsed between throwing the phone on the bed and picking it back up and snapping it in half?

A:     In that statement what is not stated, ma'am, is the entire time, we were fighting. The entire time she was arguing. She followed me to the room when I threw the computer on the bed.

Q:     You have never stated that before, have you?

A:     There's a—like I said, ma'am, that statement is a broad spectrum. It goes over a four hour period.

. . . .

Q:     So how much time elapsed from throwing that phone on the bed and picking it up and snapping it in half?

A:     Maybe a minute or two.

Q:     But you're extremely enraged during that period?

A:     Yes, the argument still continued.

. . . .

Q:     . . . . Was there a continuous argument?

A:     Yes. That was minor, minor time, ma'am.

Q:     I'm sorry. Minor what?

A:     There was a minor period of time in that.

23

Q:      Please define minor period of time.

A:      Maybe three, maybe that fight lasted—that argument lasted three, four minutes when I broke the phone.

Q:      You then went in and picked up your daughter?

A:      My daughter was standing in the room I believe is what the statement says, ma'am.

Q:      We're not talking about what the statement says, we're talking about what actually happened.

A:      Yes, my daughter was in the room at that time period.

Q:      So you picked up your daughter and you're extremely enraged and it's your testimony that as an extremely enraged individual you picked up your daughter?

A:      I picked up my daughter to remove her from the room because she did not need to be there with us arguing.

. . . .

Q:      Okay.  So now it's your testimony that you did have your daughter in your arms when you were extremely enraged?

A:      Yes.  I had picked up my daughter and I was—I had the phone in my hand.

Q:      And you were extremely enraged, correct?

A:      No, I was angry, ma'am, yes.

Q:      Okay.  So now you're just angry.  So you've gone from extreme rage to anger in the course of this fight, correct?

A:      Ma'am?

Q:      It's a yes or no question, please just answer the question.

A:      I was extremely angered, ma'am.

24

Q:      You just testified that you were angry during that time period; is that not the truth?

A:      I said that I was angry, ma'am, yes.

Q:      But not extremely. You made that a point?

A:      I did not make a point of not say[ing] extremely, ma'am.

. . . .

Q:      So you had enough presence of mind to put your daughter down before attacking your wife, correct?

A:      I put my daughter down so that she would not be further injured.

Q:      Okay. So you had enough presence of mind to put your daughter down before attacking your wife? Yes or no?

A:      Yes, my wife was still attacking me.

Q:      But you had enough of your mind to think, I don't want to injure my daughter so I'm going to put her down, correct?

A:      Yes, ma'am.

Q:      Then you attacked her, correct?

A:      Yes, ma'am, my wife and I got into a physical fight.

Swearingen called a psychologist, Dr. Frank Pugliese, who testified that, in his expert opinion, it was "possible" that Swearingen's emotions got the better of him at that moment that he strangled Stephanie. However, on cross-examination, Pugliese acknowledged that it was also "possible" that Swearingen was malingering in an attempt to protect himself, but claimed that he did not think Swearingen had been. On the other hand, Pugliese admitted that he "really can't say" what Swearingen's state of mind was at the time Swearingen killed Stephanie.

25

The State also presented evidence that Swearingen had, in the past, mentioned killing Stephanie. Swearingen admitted that there was what he characterized as "a running joke" among himself; Austin Twombly, a close friend and fellow soldier; and each of their wives "about killing each other for the insurance benefits." Also, in rebuttal, Twombly testified that Swearingen had told him in August 2006 "that if he ever did kill [Stephanie], he'd take her back to Missouri and bury her in a dry well where no one would ever be able to find her."

The jury was properly instructed that to prove sudden passion, Swearingen had the burden of establishing, by a preponderance of the evidence, that he caused Stephanie's death "while under the immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code Ann. § 19.02(d); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). "Sudden passion" was defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id*. § 19.02(a)(2). "Adequate cause" was correctly defined as a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id*. § 19.02(a)(1). The court of criminal appeals has summarized these elements as "there was an adequate provocation, that a passion or an emotion such as fear, terror, anger, rage, or resentment existed, that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide." *McKinney*, 179 S.W.3d at 569. The core concept is that a person's mental state has rendered him incapable of rational thought and collected action. *See Kennedy*

26

*v. State*, 193 S.W.3d 645, 653-54 (Tex. App.—Fort Worth 2006, pet. ref'd). The mere fact that someone acts in response to provocation of another is not enough. *Trevino v. State*, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003).

There was little, if any, evidence that Swearingen could have been acting under the immediate influence of sudden passion when, after strangling Stephanie, he "threw her" into the half-full bathtub, left her there, and later placed her in a car trunk with a trash bag over her head—all means through which the jury could have found Swearingen intentionally or knowingly caused Stephanie's death. In fact, Swearingen acknowledged that he had moved Stephanie to the bathtub and later placed the trash bag over her head to avoid leaving evidence of her blood or water on the carpet. Such calculated acts belie Swearingen being incapable of rational thought or self-control. At most, Swearingen presented evidence relevant to a theory that he had been acting under the immediate influence of sudden passion during his initial act of strangling Stephanie. However, any potential probative value of such evidence was largely eviscerated by Swearingen's admissions that, prior to their final argument, he already knew of the facts that allegedly caused him to lose control—including the nature and extent of Stephanie's ongoing infidelity—and that he undertook numerous deliberative acts during their final argument and immediately prior to attacking her.

In summary, this was not a case in which the evidence of sudden passion proved to be "substantial." *See Ruiz v. State*, 753 S.W.2d 681, 685 (Tex. Crim. App. 1988). Although there may have been evidence of former provocation, the evidence was, at best, weak in establishing that Swearingen was incapable of rational thought and collected action when he strangled Stephanie, much less when he subsequently left her in a half-full bathtub and otherwise attempted to conceal

27

evidence of his acts. *See, e.g.*, *McKinney*, 179 S.W.3d at 570 (holding that victim pushing and yelling at defendant just before defendant shot victim was not adequate cause to give rise to immediate influence of sudden passion because fight began earlier in the day); *Bradshaw*, 244 S.W.3d at 503.

Considering the entire record, including the jury charge, the parties' arguments at trial, and the weight of the evidence, we cannot find anything more than "theoretical" harm stemming from the charge error. *See Bradshaw*, 244 S.W.3d at 498; *see also Curry*, 222 S.W.3d at 753 (concluding that defendant's speculation that one juror "might have found sudden passion" is "theoretical harm that we will not credit."); *Newton*, 168 S.W.3d at 258 ("The harm must be actual, and not just theoretical."). Absent egregious harm, we must overrule Swearingen's second issue.

**CONCLUSION**

Having overruled Swearingen's issues, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: December 4, 2008

Publish