# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00208-CR

**Carlos Kidd, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
### NO. CR 21,636, HONORABLE ED MAGRE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Carlos Kidd guilty of escape. *See* Tex. Penal Code Ann. § 38.06 (West Supp. 2009). The jury found the enhancement allegation in the indictment true and assessed punishment at ten years' imprisonment and a $5,000 fine. In two points of error, Kidd argues that the evidence was legally insufficient to support his conviction and that the trial court erred in failing to include in the jury charge the entirety of his proposed jury instruction on necessity. Having found no reversible error, we affirm the judgment of conviction.

### FACTUAL AND PROCEDURAL BACKGROUND

On the evening of October 31, 2005, Kidd, a Texas Department of Criminal Justice ("TDCJ") inmate, claimed to have inserted a razor blade into his penis and was sent to the infirmary. Daniel Thorn, the licensed vocational nurse who examined Kidd, did not see any visible injury.

Nonetheless, Thorn called the on-call medical provider,[1] who ordered that Kidd be transported to the University of Texas Medical Branch Galveston ("UTMB") emergency room for further examination, then sent on to a TDCJ mental health facility for psychiatric evaluation. Thorn called TDCJ security and requested a van for transport.

Correctional officer Omar Scarbrough brought the van to the back gate of the infirmary. Scarbrough testified that when he arrived, Kidd was restrained.[2] Scarbrough helped load Kidd into the van and closed and locked the van's interior metal cage around him. In accordance with normal procedure for transports to UTMB, one officer, Jose Cirilo, drove the van, and another, Latarsha Spears, rode along as an armed passenger. TDCJ procedures provide that transportation officers have the keys to the back of the van and restraints, as well as the authority to use deadly force should an inmate try to escape.

Michelle D'Alesandro, a law enforcement officer at UTMB, was on duty at the UTMB emergency room when the van arrived. She testified: "I did not see any prisoners; all I seen was a driver and a passenger and no one in the back half of that van." After the van parked, Spears walked around to the back, and opened the door. Officer D'Alesandro testified that Spears "was frantic, panic-stricken," and that she ran to D'Alesandro and said that "the inmate [was] gone."

---

[1] The record shows that the on-call providers are doctors, nurse practitioners, and physician's assistants who take turns answering after-hour phone calls related to the inmates' medical care.

[2] On direct examination, Scarbrough testified that when Kidd arrived at the van, he was restrained "except for the handcuff box." On cross-examination, he testified that "when he left the unit," Kidd was restrained with handcuffs, ankle shackles, a chain running from the handcuffs to the ankle chain, and a handcuff box. He explained that the handcuff box is a "little black rectangular box" that "is designed to prevent the person who's handcuffed from twisting their hands."

2

Officer D'Alesandro asked Spears for Kidd's identifying information and notified her dispatcher of his escape. Spears told Officer D'Alesandro that she noticed Kidd in the back of the van while they were in Galveston approximately five to ten minutes before arriving at the hospital. Officer D'Alesandro asked Spears to open the van. She observed that the interior cage was "already down" and that the handcuffs and shackles were laid on the seat, closed back and secured. The handcuff box was padlocked around the handcuffs.

Melberic Player, a TDCJ officer at UTMB, also observed the restraints laid neatly on the van's seat. He pushed on the van's back window lightly with his pen and "just with no force, it fell out." Mark Bowers, a criminal investigator with the TDCJ Office of the Inspector General also reported to the scene. He interviewed Cirilo and Spears. He observed that the van's rear window latch had been damaged and "appeared to be jimmied and manipulated in some way with some type of object." He observed scratches around the frame of the window that had been pushed out but not the other back window. He testified that if regular procedures had been followed, Kidd would have undergone a body cavity search prior to entering the van, and that the van would have been searched throughly before Kidd was loaded into it.

At approximately 8:30 p.m. on November 1, Dickinson[3] Police Officer Christopher McCollum was dispatched to a Kroger store in response to a report that someone at the store resembled Kidd. He and another officer waited for Kidd to come out of the store bathroom and asked him for identification. When he had none, Officer McCollum handcuffed him. McCollum

---

[3] Officer McCollum testified that Dickinson is located approximately halfway between Houston and Galveston along I-45.

testified that Kidd then stated, "Okay, you got me," and told him that his name was Carlos Ray Kidd. McCollum testified that Kidd asked him what level offense the crime of escape was.

Kidd was arrested and indicted for escape. His indictment contained an enhancement allegation that, prior to his escape, his conviction for burglary of a habitation became final. At trial, Scarbrough, D'Alesandro, Player, Bowers, and McCollum testified for the State. The State also presented the testimony of the assistant warden of Kidd's unit and a Special Prosecution Unit investigator regarding the restraints used on Kidd. Cirilo and Spears, who were disciplined for reckless endangerment and dismissed from employment with TDCJ, did not testify.

After the State rested, the defense moved for directed verdict. The court denied the motion, and Kidd took the stand. He testified that he had been transferred to UTMB several times prior to the October 31 incident, each time claiming self-inflicted injuries caused by swallowing razor blades or inserting things into his penis. He explained:

> I wasn't getting any help or any relief on the unit level. I would go to the wardens for help, I would go to the officers for help for my safety, and they wouldn't do anything for me, you know. They would tell me, "Hey, well, we don't have no evidence of this, we don't have no evidence of that."
>
> And it got to the point where that I felt that my safety and my life was in such imminent danger that I had to inflict some type of harm on myself to be moved off the unit, and the only means to do that would be to harm myself some way. And that is the only way to be able to get off the unit . . . .
>
> I figured that if I went to the hospital, that I could talk to doctors—people that wasn't on the unit, doctors and officials at the hospital and explain my situation to them and maybe they could help me somehow and maybe override the prison and get me moved to another unit somewhere where I was safe.

Kidd testified regarding the difficulties he faced within the TDCJ system since his 2002 convictions for aggravated assault with a deadly weapon and burglary of a habitation. In 2003, Kidd reported being sexually assaulted by a corrections officer, who was eventually convicted of improper sexual activity with a person in custody. Kidd testified that after he reported the assault, he received numerous threats from other inmates on the officer's behalf. He was subsequently transferred to several different units, but the threats followed him. In one unit, he reported being sexually assaulted by an inmate and was placed in protective custody.[4]

In October 2005, Kidd received a note under the door of his cell. The note was written on a prison roster, which Kidd testified is something "inmates are not supposed to have." The note referenced the inmate who had sexually assaulted Kidd, as well as Kidd's pending federal lawsuit against TDCJ, and stated that if Kidd did not dismiss the lawsuit, he would "leave the unit in a body bag." Kidd testified that he took this to mean that his life was "in immediate danger and imminent harm." He filed a life-in-danger report,[5] and the incident was investigated, but he was not moved and his protection level was not increased. After he reported the letter, the other inmates in his unit harassed and threatened him. When officers walked him out of his cell and down the cellblock, the inmates spat on him, threw urine and feces at him, and once shot at him with a homemade spear. Kidd testified that at the time of his escape, "I believed that my life was in such

---

[4] Assistant Warden David Turrubiarte testified that an inmate is placed in protective custody "[i]f there's serious threats or known threats that has happened against him." He explained that in protective custody, inmates are housed in single cells and have verbal but no physical contact with other inmates. Inmates in protective custody eat, shower, and recreate alone.

[5] Since entering the TDCJ system, Kidd filed at least 39 life-in-danger reports.

imminent danger that I was desperate—kind of beyond desperate; I was in desperation to get off that unit . . . . I was just in desperation for my safety." He testified that the ACLU was advocating for his transfer to another state "where there wouldn't be a connection between these Texas prison gangs . . . where I could peacefully do my time without being in danger."

Kidd testified that he escaped through the van's back window after one of the officers removed his restraints. He stated that he then hid in the woods because he was "scared" and "confused." He was arrested when he went into the Kroger to get some water.

The jury found Kidd guilty of escape, found the enhancement allegation to be true, and sentenced Kidd to ten years' imprisonment and a $5,000 fine. On appeal, Kidd contends that the evidence is legally insufficient to support his conviction and that the trial court erred in failing to include in the jury charge the entirety of his proposed instruction on necessity.

## DISCUSSION

In his first issue, Kidd challenges the legal sufficiency of the evidence to support his conviction. In reviewing the legal sufficiency of evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether a rational fact-finder would have found the essential elements of the crime beyond a reasonable doubt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We assume the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in support of the verdict. *Id*.

The State was required to prove beyond a reasonable doubt that Kidd escaped from custody while under arrest for, charged with, or convicted of an offense, or while in custody pursuant

6

to a lawful court order. *See* Tex. Penal Code Ann. § 38.06. The penal code defines "escape" as an "unauthorized departure from custody." *Id*. § 38.01(2) (West 2003). Kidd contends that the State did not meet its burden because: (1) if he jumped out of the van while it was moving, it is not rational that he would or could have re-fastened the restraints and replaced the window; (2) Cirilo and Spears did not testify and, thus, there was no evidence as to whether the van stopped, or, if it did, whether such stop was authorized; and (3) the State did not present evidence showing that Cirilo and Spears did not release Kidd.

Kidd's arguments all go to whether the State proved that his departure from custody was unauthorized. The State presented evidence that Kidd was a TDCJ inmate, he was secured in the van when it left the prison, and he was no longer in the van when it arrived at the hospital. Although Kidd also testified that the officers removed his restraints, even assuming this to be true, it does not refute the evidence that Kidd's departure from custody was unauthorized. Kidd also testified that he escaped through the back window of the van. His testimony that he went through the van's back window and the fact that he hid in the woods after his escape shows his knowledge that, if in fact Cirilo and Spears released his restraints, they did not have the authority to release him from custody. The State's evidence coupled with Kidd's testimony is legally sufficient evidence of escape. *See Lawhorn v. State*, 898 S.W.2d 886, 890 (Tex. Crim. App. 1995) (offense of escape complete when inmate ran from guard's custody or, at very latest, when guard gave up pursuit and called for assistance); *Scott v. State*, 672 S.W.2d 465, 466 (Tex. Crim. App. 1984) (although inmate never left confinement of fenced yard surrounding jail or surveillance by deputies, offense of escape complete when inmate dug out of building and entered into yard without authorization);

7

*Webb v. State*, 533 S.W.2d 780, 788 (Tex. Crim. App. 1976) (sufficient evidence of escape when guards testified that defendant was left alone to paint room, but when guard checked back, defendant was gone, window was open, gravel below window was disturbed, and defendant was found on another roof with broken leg); *Sanders v. State*, 675 S.W.2d 579, 580 (Tex. App.—Houston [14th Dist.] 1984, no pet.) (escape occurred when defendant failed to return to custody for commencement of sentence after being granted temporary leave to dispose of personal matters). We overrule Kidd's first issue.

In his second issue, Kidd argues that the trial court erred in failing to provide the jury with his entire proposed instruction on necessity. We review claims of jury-charge error under a two-pronged test. *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). We first ask whether error occurred. *Id.* If there was error, we next evaluate the harm caused by the error. *Id.* "The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only 'some harm.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

Necessity is a statutory defense that exonerates a person's otherwise illegal conduct. *See* Tex. Penal Code Ann. § 9.02 (West 2003). Conduct that would otherwise be criminal is justified by necessity if:

(1)     the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

8

> (2)    the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
>
> (3)    a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

*Id*. § 9.22 (West 2003).

Kidd contends that the charge failed to advise the jury that the State had the burden of disproving necessity beyond a reasonable doubt. The State argues that Kidd was not entitled to the instruction because the evidence did not raise at least one element of the necessity defense—that Kidd reasonably believed that escape was immediately necessary to avoid imminent harm. The State asserts that because Kidd was not entitled to the instruction in the first place, even if the trial court erred in overruling his objection and failing to use his preferred wording, the error is harmless. Alternatively, the State argues that the necessity instruction given was proper.

The defendant has the initial burden of bringing forth evidence supporting the defense of necessity. *Id*. § 2.03(c) (West 2003); *Stefanoff v. State*, 78 S.W.3d 496, 500 (Tex. App.—Austin 2002, pet. ref'd). If he produces evidence, regardless of its source or strength, that raises every element of the defense, the burden shifts to the State to disprove the defense beyond a reasonable doubt. Tex. Penal Code Ann. § 2.03(d); *Stefanoff*, 78 S.W.3d at 500.

Here, Kidd did not meet his initial burden of producing evidence to raise the "immediately necessary to avoid imminent harm" element of the necessity defense. *See* Tex. Penal Code Ann. § 9.22(1). Kidd contends that his testimony regarding the threats and harassment he faced within his unit, as well as his fears for his safety at the TDCJ mental health facility to which

9

he would be transferred after his visit to the hospital, established that he reasonably believed escape was immediately necessary to avoid imminent harm. To raise the defense of necessity, the defendant must bring forth evidence of a specific, imminent harm. *Stefanoff*, 78 S.W.3d at 500. "Imminent" is defined as "something that is immediate, something that is going to happen now." *Id.* at 501. "[I]mminent harm contemplates a reaction to a circumstance that must be the result of a 'split second decision [made] without time to consider the law.'" *Id*. (quoting *Smith v. State*, 874 S.W.2d 269, 273 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd)).

Assuming Kidd genuinely feared for his safety on a day-to-day basis while in his unit, more than a generalized fear of harm as a result of his continued incarceration is required to raise the issue of imminent harm. *See id*. (citing *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.)). Likewise, his testimony that he feared for his safety upon arriving at the mental health facility after being released from the hospital is insufficient to raise imminent harm. Imminent harm requires "an immediate, non-deliberative action made without hesitation or thought of the legal consequence." *Id.* (citing *Smith*, 874 S.W.2d at 272-73). Kidd's decision to escape was considered. He testified that he injured himself at night because he knew that there was no doctor on duty at the prison unit and that he would be transported to UTMB.

Even if Kidd properly raised imminent harm, the evidence refuted the immediate necessity element beyond a reasonable doubt. "After adducing evidence of imminent harm, a defendant must next establish facts indicating a *reasonable belief* that the criminal conduct was *immediately necessary* to avoid the imminent harm." *Id*. (citing Tex. Penal Code Ann. § 9.22(1)). A "reasonable belief" is one that would be held by an ordinary, prudent person in the defendant's

same circumstances. *Id.* (citing Tex. Penal Code Ann. § 1.07(a)(42) (West Supp. 2009)). Reasonableness is evaluated from the defendant's point of view at the time of the offense. *Id.* (citing *Fitzgerald v. State*, 782 S.W.2d 876, 885 (Tex. Crim. App. 1990)). Kidd conceded that at the time of his escape, he did not reasonably believe escape was immediately necessary to avoid imminent harm when he testified as follows:

> Q.  Immediate danger is something that's going to happen right then; would you agree with that?
>
> A.  Yes, I do.
>
> Q.  There was no imminent danger to you in that van or at the hospital in Galveston; is that correct?
>
> A.  That's correct.

Despite his fears for his safety at the mental health facility and eventually back at his unit, while he was in the van on his way to the hospital, Kidd did not have the requisite reasonable belief that his escape was immediately necessary to avoid imminent harm.

Because he failed to present evidence that his escape was immediately necessary to avoid imminent harm, Kidd was not entitled to an instruction on necessity. Thus, even if the necessity instruction improperly stated the State's burden of proof, any such error was harmless. We overrule Kidd's second point of error.

## CONCLUSION

Having overruled Kidd's issues on appeal, we affirm the trial court's judgment of conviction.

11

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   February 4, 2010

Do Not Publish