

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-24-00392-CR

Maximiliano **GAZCA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 381st Judicial District Court, Starr County, Texas
Trial Court No. 20-CR-119
Honorable Jose Luis Garza, Judge Presiding

Opinion by:      Velia J. Meza, Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 H. Todd McCray, Justice
                 Velia J. Meza, Justice

Delivered and Filed: June 17, 2026

AFFIRMED

A jury convicted Maximiliano Gazca of murder and assessed punishment at forty years' confinement in the Texas Department of Criminal Justice, Institutional Division. The trial court imposed the sentence consistent with the verdict. In his first point of error, Gazca argues the trial court abused its discretion by admitting the testimony of the State's crime-scene reconstruction

expert, asserting the expert's opinions were inadmissible *ipse dixit*[1] under Rule 702 and *Kelly*. Second, he argues the court erred in denying his motion for new trial based on alleged juror misconduct—specifically, a juror's purported failure to disclose a relationship with a person connected to the case and, separately, the juror's alleged prohibited contact with that person after the close of evidence. As the record and governing law show, Gazca did not preserve any challenge to the reliability of the expert's testimony; his first issue therefore presents nothing for our review. As to the second issue, the motion for new trial was filed without affidavits or other competent evidence establishing facts outside the record, and the trial court was free to disbelieve the unsworn allegations of misconduct. Because the record supports the trial court's decision to deny the motion for new trial, the court did not abuse its discretion. We affirm.

## BACKGROUND[2]

Over six days of trial, the jury in Starr County heard extensive evidence concerning the shooting death of Antonio "Tony" Aguilera. The State introduced eyewitness accounts, physical evidence, and expert testimony to support its theory that Gazca intentionally fired nineteen shots at Aguilera, striking him sixteen times. Investigating officers described their response to the scene, the collection of physical evidence—including a cell phone—and the subsequent recovery of the firearm from Gazca's residence.

Gazca, however, testified that he acted in self-defense. He stated that he heard his sister screaming outside, saw Aguilera walking onto the property, and ordered him to leave. According to Gazca, when Aguilera refused, he went inside the house, "got [his] gun, loaded it, [and] shot three times..." The jury ultimately evaluated these competing theories in reaching its verdict.

---

[1] *Ipse dixit* is a Latin term that translates to "he himself said it." See *Ipse Dixit*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[2] The record spans forty-seven volumes and contains hundreds of exhibits; we recount only those facts necessary to resolve the issues presented on appeal.

To establish why Aguilera was on Gazca's property at the time of the shooting, the State presented testimony from Aguilera's mother, Ana Maria Cortez. She explained that Aguilera had three daughters and was living with his partner, Selene Yajaira Garza, in a rented home in El Arroyo near Rio Grande City. On the afternoon of July 4, 2020, Cortez was working as a provider in La Victoria when Garza dropped Aguilera off around 3:30 p.m. Aguilera appeared sad and crying and told her Garza had left him. After Cortez finished work at 4:00 p.m., she drove Aguilera toward his home, but as they approached Garciasville, Garza called and asked him to come to her family's (Gazcas') residence instead. Cortez drove Aguilera to the Gazca residence and parked near the entrance.

Cortez testified that she walked with Aguilera toward the entrance after Garza insisted he go with her inside. Cortez then returned to her truck, leaving Garza and Aguilera talking outside. Moments later, Cortez heard what sounded like fireworks, ran toward the house, and found her son lying face down on the ground. She saw Garza and Gazca standing on the porch. As Cortez approached, Aguilera briefly lifted his head and said "Mommy, Mommy" before Gazca shot him again multiple times. As Cortez attempted to reach her son, Gazca pointed a gun at her and threatened to shoot if she came closer, causing her to retreat. Cortez ran back to her truck to call 911. She identified Gazca in court as the person who shot Aguilera.

To corroborate the communications occurring before Aguilera reached the property, the State next presented Special Agent Joseph Mirino, a digital forensic examiner with Homeland Security Investigations. After describing his experience and qualifications, he explained that he conducted the forensic extraction of a Motorola Moto E cellphone using Cellebrite. Mirino described Cellebrite as a forensic tool that creates a one-way transfer of data from the device to a

forensic workstation, ensuring that information flows only from the phone to the examiner's system and thereby preserving data integrity.

Mirino testified that the extracted data included a TextNow conversation occurring on July 4, 2020, between the phone's user—identified as Selene Garza—and a contact saved as "mi corazon." He explained that TextNow functions like standard SMS messaging but uses internet data rather than cellular carrier service. The Cellebrite report displayed messages and audio clips in chronological order and automatically converted timestamps from UTC to Central Time.

The broader record reflects that approximately an hour before the shooting, the text communications between Garza and Aguilera were hostile. Mirino testified the conversation began at 3:44 p.m., when "mi corazon" sent an incoming message to Garza's phone. The exchange included a mixture of text messages and short audio clips, which Mirino identified as either incoming or outgoing between the two devices. Several incoming messages from "mi corazon" contained profanity, insults, and derogatory language, including "Fuck you," "ungrateful," and "Don't text or call." Other messages consisted of repeated "Bye" or "Bye-bye" texts. Mirino also played multiple outgoing audio messages sent from Garza's device between 3:45 p.m. and 3:51 p.m., which were translated for the jury.

The record reflects that at approximately 3:54 p.m., Garza's tone shifted and she began asking Aguilera to "fix this." Aguilera responded by asking her for money, and Garza eventually agreed to give him money if he came to the residence where she was staying with her mother and brother. At 4:25 p.m., Mirino testified that TextNow incoming messages to Garza's phone read, "I'm almost there," and "at your house." Mirino concluded his testimony by affirming that the TextNow messages and audio files extracted from the device accurately reflected the entire

exchange. According to the custodian of records who testified at trial, the 911 call was received at 4:28 p.m., shortly after the shooting began.

Dr. Norma Jean Farley, a forensic pathologist contracted with Hidalgo County, testified regarding the autopsy she performed in this case. Dr. Farley testified that after she cleaned Aguilera's body, she identified 16 gunshot wounds. Gunshot Wound No. 2 was, in her opinion, a fatal wound. The bullet perforated the left fifth rib, continued through the upper lobe of the left lung, perforated all the way through the heart, and ended in the liver. She explained that approximately 180 milliliters of blood accumulated in the pericardial sac and another 500 milliliters in the left chest cavity, causing cardiac tamponade, a condition in which external pressure from blood prevents the heart from functioning. Dr. Farley testified that this type of heart injury would cause death within minutes, not hours, depending on the person's activity level and heart rate. She agreed with the State that Aguilera would likely have remained conscious initially, and it was possible he could have lifted his head or communicated briefly before becoming unconscious.

**Forensic Expert Michael Maloney: Qualifications**

To help the jury understand the physical evidence underlying the shooting, the State presented the testimony of Michael Maloney, a crime-scene reconstruction expert who analyzed the physical evidence to reconstruct the shooting.

In a hearing outside the presence of the jury, the trial court heard testimony from Mr. Michael Maloney, whom the State offered as an expert in crime-scene reconstruction and related forensic disciplines. Maloney testified that he performs crime-scene reconstruction, provides training and seminars, conducts forensic consulting, and has authored two books in the field. He owns Forensic Solutions Incorporated, through which he instructs law enforcement personnel

domestically and internationally on shooting incident reconstruction, bloodstain pattern analysis, crime-scene reconstruction, and death scene investigation.

Maloney described a lengthy professional background beginning as a deputy and police officer, followed by five years of service in the United States Marine Corps. He later served as a senior instructor at the Department of Homeland Security's Federal Law Enforcement Training Center, specializing in death investigations and crimes against persons. After retiring from federal service, he founded his forensic training company.

Maloney explained he has held multiple forensic certificates, though he could not obtain the International Association for Identification's crime-scene investigation certificate because he helped write the examination. He is a certified criminal investigator through the federal system and a certified criminal investigative special agent. His training includes wound dynamics, mechanisms of injury, shooting reconstruction, bloodstain pattern analysis, forensic anthropology, and other specialized coursework. He also holds a master's degree in forensic science and completed a year-long fellowship in forensic medicine under a medical examiner, where he gained experience in autopsies, wound dynamics, mechanisms of injury, and cause-of-death determinations.

Maloney has taught shooting reconstruction and bloodstain-pattern courses more than forty times, has presented cases at national and international training programs, has published articles in the field, and has testified approximately 25–30 times previously. His curriculum vitae was admitted as State's Exhibit 337 for the trial court's review.

Maloney clarified that he is an expert in bloodstain pattern analysis, not "blood splatter," and that he was not asked to perform blood spatter analysis in this case. He acknowledged that he does not hold specific accreditation in bloodstain analysis.

**Maloney's Methodology:**

Maloney testified that crime-scene reconstruction follows the scientific method, beginning with the identification of possible events, followed by sequencing those events through deductive reasoning. He explained that investigators isolate individual pieces of forensic evidence to determine "who was where and doing what" during the critical moments of the incident. He acknowledged that reconstruction is limited by the condition of the crime scene.

He described his training in the use of visual aids, including LIDAR, to demonstrate bullet paths. LIDAR technology allows investigators to digitally remove or manipulate objects to determine possible shooter and victim positions. Autopsy findings are incorporated by placing wound locations onto a digital representation of the body and tracing the bullet's likely path. Maloney testified that shooting incident reconstruction has been accepted as scientifically valid in prior court proceedings.

Maloney prepared a report in this case and reviewed extensive materials, including LIDAR scans, autopsy and toxicology reports, autopsy photographs, crime scene photographs, firearms and toolmark reports, gunshot residue analysis, officer incident reports, interviews of Gazca and of his sister, Starr County Sheriff's Office investigative materials, Texas Ranger supplemental reports and field notes, and Valley Forensic inventory forms.[3]

During his testimony to the jury, Maloney testified how he analyzes gunshot wound dynamics during an autopsy. He identifies entrance and exit wounds, determines bullet paths through the body, and evaluates whether bullets passed through soft tissue, struck bone, or re-entered the body. Because bodies at autopsy lie in a neutral, "sterile" position, he uses dynamic

---

[3] During a discussion outside the presence of the jury, defense counsel objected that the witness lacked qualifications in blood-spatter analysis. The State clarified that the witness would not offer blood-spatter opinions but would reference blood evidence generally. The trial court limited the testimony accordingly and found the witness qualified within those parameters.

positioning to reconstruct how the victim's body must have been oriented when each shot was fired.

To integrate the autopsy findings with the physical scene, Maloney used LIDAR technology to create a precise three-dimensional model of the environment. He imported the LIDAR data into a CAD program to remove irrelevant clutter and retain only objects that affected movement or line of fire. He then created a forensic reconstruction using 3D modeling to represent Aguilera's body type, height, and weight, and placed each entrance and exit wound on the model. Using the autopsy report, he drew the bullet trajectories and extrapolated the likely direction from which each shot originated.

Maloney walked the jury through each gunshot wound in isolation, showing how the trajectories struck Aguilera's chest, hip, shoulder, back, lower back, buttocks, and, in one instance, passed between the legs and creased against the scrotum. He explained that the trajectory rods on the model represented the direction from which each bullet traveled and that some shots—such as one involving the forearm—could vary depending on how Aguilera's arm was positioned.

Using the combined autopsy and scene data, Maloney identified what he called two distinct shooting corridors. The first accounted for the initial shots to the chest, shoulder, arm, and upper back. These trajectories required Aguilera to present specific parts of his body—such as the right or left front shoulder—toward the shooter. As the shooting progressed, Maloney explained, Aguilera would have turned, dropped, or fallen, eventually lowering his body below nearby objects such as a table or dog kennel.

The second shooting corridor accounted for the shots to the lower back, buttocks, and the trajectory passing between the legs. Maloney testified that the unusual angles of these shots could be explained in only two ways: either the shooter moved or Aguilera moved. Based on the location

of spent casings and physical obstructions, he concluded that the shooter likely remained in the same general area. Therefore, Aguilera must have been changing position—such as falling forward or rising onto his knees—during the final shots, which brought those trajectories into alignment with the shooter's position.

On cross-examination, defense counsel questioned Maloney on several matters related to the State's demonstrative exhibit. Counsel elicited that Maloney relied on LIDAR measurements that were not obtained until approximately twenty-seven months after the shooting and that he did not know whether any structural changes had been made to the residence during that period. Maloney further acknowledged that his demonstrative exhibit depicted only eighteen or nineteen shell casings and that a red truck appearing in the scene had not been removed from the rendering. Counsel also questioned him about his compensation, establishing that he had been paid approximately $15,000 for his work, and confirmed that he had never personally traveled to Starr County in connection with the case. At the conclusion of Maloney's testimony, the State rested its case in chief.

The defense called Appellant Maximiliano Gazca in its presentation of evidence. Gazca testified that he was twenty years old on July 4, 2020. He stated that he awoke late that day and heard his sister, Selene Garza, crying and arguing with Aguilera on the phone. According to Gazca, Garza told him that Aguilera wanted money and intended to come to the house. Gazca said he told Garza to tell Aguilera not to come. Gazca testified that he was preparing to leave to celebrate the holiday with friends when he heard yelling outside. He went outside and saw Aguilera enter the property. Gazca stated that he told Aguilera to leave multiple times, but Aguilera refused. Gazca then went inside, retrieved a gun, loaded it, and fired three "warning shots." He testified that Aguilera continued approaching him, laughing and insulting him, and that he feared Aguilera

might harm him, his sister, or his nephew. Gazca said he fired at Aguilera because he was afraid, referring to stories Aguilera had told him about using crack cocaine and acting violently. Gazca testified that he did not intend to kill Aguilera and only wanted to stop him.

On cross-examination, Gazca acknowledged that he did not hear Aguilera say anything during the argument with his sister. He confirmed that within the three-minute window between Aguilera's arrival and the 4:28 p.m. 911 call, he told Aguilera to leave, retrieved and loaded his gun, fired warning shots, and then shot Aguilera multiple times. He admitted he never saw Aguilera with a weapon and that Aguilera did not physically attack him, though he said Aguilera was walking toward him. Gazca denied pointing a gun at Aguilera's mother or threatening her. Gazca maintained that he acted out of fear and did not intend to kill Aguilera. The jury returned a verdict of guilty on Count 1, charging Gazca with the murder of Aguilera, and not guilty on Count 2, the aggravated assault charge involving Aguilera's mother, Ana Maria Cortez.

On May 6, 2024, after hearing the evidence presented at the punishment phase—including Gazca's claim that he acted under the influence of sudden passion and his request for community supervision—the jury rejected that claim and found he did not act under sudden passion. The jury then assessed his punishment at 40 years' confinement, with no fine.

Thereafter, on June 6, 2024, Gazca filed a notice of appeal and contemporaneous motion for new trial alleging, in relevant part, two instances of juror misconduct. The motion asserted that a juror failed to disclose material information during voir dire that he knew the Starr County District Clerk Orlando Velasquez. Second, the motion alleged that on May 4, 2020—after both sides had rested and after the trial court had admonished the jury under Article 36.22 not to converse or mingle with persons connected to the case, the juror was photographed at a municipal election site with the Starr County District Clerk, Orlando Velasquez. The motion asserted that

Velasquez is the fiancé of the lead prosecutor. The motion further alleged that this relationship was not discovered until after trial, when a "Deed of Gift" from Velasquez and the juror came to light. According to the motion, the juror's conduct created a presumption of injury to the accused. The motion included only three exhibits—a photograph, a gift deed, and a brochure, and failed to include any affidavits. On July 18, 2020, the trial court signed an "Order Denying Motion for New Trial and Hearing or Order Denying Motion for New Trial and Order to Set Aside Order Setting Hearing," thereby denying Gazca's post-judgment motions. This appeal followed.

## DISCUSSION

### Standard of Review: Rule 702

As a threshold matter, we address whether Gazca preserved error under Rule 702 of the Texas Rules of Evidence.

Gazca argues the trial court erred by admitting Maloney's expert testimony despite an alleged failure to satisfy Rule 702's reliability requirements. If the opponent fails to object, however, the complaint is waived, and the reviewing court will treat the expert as qualified. *Matson v. State*, 819 S.W.2d 839, 851–52 (Tex. Crim. App. 1991).

The admissibility of expert testimony is governed by Texas Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702; see also *Null v. State*, 690 S.W.3d 305, 311 (Tex. Crim. App. 2024).

Preservation of error is governed by Texas Rule of Appellate Procedure 33.1. Under that rule, a party preserves error only if the record shows a timely objection or request stating the

specific grounds for the desired ruling, unless those grounds were apparent from the context. TEX. R. APP. P. 33.1(a)(1)(A); see also *Null*, 690 S.W.3d at 318.

"The purpose for requiring a timely, specific objection is twofold: (1) it informs the judge of the basis of the objection and affords him an opportunity to rule on it[;] and (2) it affords opposing counsel an opportunity to respond to the complaint." *Null*, 690 S.W.3d at 318 (quoting *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021)). Preservation of error is a systemic requirement, and "on direct appeal it has been the common practice of this Court and of the intermediate appellate courts in Texas to examine matters affecting the preservation of error, whether separately argued by the parties or not." *Id.* (citing *Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1992) (op. on reh'g)); see also *Fuller v. State*, 829 S.W.2d 191, 199 n.4 (Tex. Crim. App. 1992).

**Error Not Preserved**

The record in this case reflects that Gazca objected to Maloney's qualifications on the ground that the State designated him as a blood-spatter expert even though he lacked the necessary accreditation. Counsel moved either to strike the witness or limit his testimony accordingly. At most, the objection sought to limit the scope of the witness's testimony to matters within his training and credentials. Nothing in the exchange alerted the trial court to any complaint regarding the reliability of the scientific principles or methodologies underlying crime-scene reconstruction under Rule 702, *Kelly*, or the *ipse dixit* doctrine. Counsel never invoked *Kelly*, challenged any underlying scientific theory or technique, or requested a reliability hearing.

MS. GARZA: Your Honor, I was going to ask that he be stricken because, as he had indicated, Your Honor – he had gone into the blood splatter analysis that he was designated to. He knew that he had to be licensed. He is not licensed, so for that reason he wouldn't be able to testify on a criminal case with blood splatter analysis. They have not indicated that that was a mistake. He is not one of those, and he clarified that he is not.

THE COURT: Is he testifying to blood spatter?

MS. BARRERA: Blood spatter, Judge, no. I mean, he is going to reference blood stains, but not blood spatter. The discipline of blood spatter is different, and, you know, I don't think it comes into question in this case.

MS. GARZA: And, Your Honor, that was the parameter -- I wanted there to be a limitation with regards to that. He indicates that he is not licensed with regards to that, and, as the Court is aware, he says he will not testify to that. Then so be it, Judge.

THE COURT: Okay. It's in the record, and the Court is going to find he's qualified. Can we move on? What else?

This objection preserved only a challenge to the witness's qualifications. It did not preserve any complaint regarding the reliability of the scientific principles or methodologies underlying the testimony.

Our conclusion is guided by the Court of Criminal Appeals' recent decision in *Null v. State*, which addressed a similar preservation issue. See *Null*, 690 S.W.3d at 318–19.[4] There, the court held that a generalized reliability objection failed to preserve the specific Rule 702 complaints raised on appeal. The court explained that Rule 702 presents distinct inquiries regarding qualification, reliability, and relevance, each of which may independently support or defeat admissibility. *Id.* at 318. The court further observed that expert testimony may rest on multiple scientific theories and methodologies and that requiring the proponent to defend every conceivable

---

[4] Judicial decisions, including criminal cases, generally apply retroactively. *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 748 (Tex. 2017); see also *Proctor v. State*, 967 S.W.2d 840, 845 n.5 (Tex. Crim. App. 1998). Accordingly, cases pending on direct appeal when a new decision is issued are ordinarily subject to that decision's governing principles. The Court of Criminal Appeals has recognized that this principle likewise applies in criminal cases. Courts may, however, expressly limit retroactive application in appropriate circumstances. *Callison v. State*, 218 S.W.3d 822, 825 (Tex. App.—Beaumont 2007, no pet.) (citing *Proctor*, 967 S.W.2d at 845 n.5).

For instance, a judicial decision may not apply retroactively when doing so would deprive a defendant of "fair warning" concerning the conduct subject to criminal penalties. *Id.* But retroactive application remains appropriate when the decision does not alter the definition of an offense, increase the range of punishment, or eliminate a substantive defense. *Id. Null* does none of those things. See generally *Null v. State*, 690 S.W.3d 305, 311 (Tex. Crim. App. 2024). Rather, it clarifies the already-existing preservation requirements codified in Texas Rule of Appellate Procedure 33.1 and applies longstanding principles governing preservation of Rule 702 complaints. See TEX. R. APP. P. 33.1. Retroactive application of *Null* therefore does not deprive Gazca of fair warning regarding conduct giving rise to criminal penalties, nor does it alter any substantive criminal right. Accordingly, *Null* applies to this appeal.

scientific principle or method in response to a vague objection would impose an "incredible burden." *Id.* at 318–19. Accordingly, the opponent must identify the particular aspect of reliability being challenged. *Id.*

Applying that reasoning here, Gazca's objection concerned only the witness's lack of blood-spatter accreditation and did not alert the trial court to any challenge to the validity or reliability of the scientific theories or methodologies underlying crime scene-reconstruction. As in *Null*, arguments concerning the reliability of those underlying principles were raised for the first time on appeal and are therefore forfeited. See TEX. R. APP. P. 33.1(a)(1)(A).

Accordingly, Gazca preserved a challenge to the witness's qualifications, but not to the reliability of the underlying scientific methodology. We therefore overrule Gazca's first issue.

**Standard of Review: Motion for New Trial**

The Court of Criminal Appeals has emphasized that a trial court's ruling on a motion for new trial is reviewed under a uniformly deferential abuse of discretion standard, *Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021). Under that standard, the trial court is the exclusive judge of the credibility of the evidence, even when the evidence is uncontroverted. *Id*. A trial court is not required to accept any factual assertion unless it is conclusively established, such as by stipulation or indisputable visual evidence. *Id.*; see also *Evans v. State*, 202 S.W.3d 158, 163–65 (Tex. Crim. App. 2006).

When the movant seeks a new trial based on matters outside the appellate record, Rule 21 requires that those facts be established by affidavit or other competent evidence. *Elston v. Sherman Coca–Cola & Dr. Pepper Co.*, 596 S.W.2d 215, 217 (Tex. App.—Texarkana 1980, no writ) (citing *Whited v. Powell*, 285 S.W.2d 364 (Tex. 1956)); see also *Mem'l Park Med. Ctr., Inc. v. Bob Thornhill Trucking*, No. 11-24-00064-CV, 2026 WL 191948, at *3 (Tex. App.—Eastland Jan. 22,

2026, pet. filed) (explaining that the purpose of the affidavit requirement is to support allegations by competent proof). Absent such proof, the trial court is free to disbelieve the allegations and deny relief.

Rule 21.3(f) requires proof that the jury received outside evidence, engaged in improper communication, or otherwise committed misconduct that probably affected the verdict. See *Najar*, 618 S.W.3d at 374. Because Gazca presented no affidavits or other competent evidence establishing such misconduct, the trial court acted within its discretion in denying the motion.

**Unsupported Allegations of Juror Misconduct Do Not Demonstrate an Abuse of Discretion.**

The motion for new trial in this case asserts that a juror committed misconduct by failing to disclose a relationship with the prosecutor when the panel was asked whether anyone knew the prosecutor or members of the district attorney's office. The motion relied primarily on *Curry v. State*, which recognized that a conviction may be reversed when a juror withholds material information despite the exercise of due diligence by the defense. See *Curry v. State*, 222 S.W.3d 745, 755 (Tex. App.—Waco 2007, pet. ref'd).

But the motion contains no affidavit or other competent evidence establishing the juror intentionally withheld relevant information, that any undisclosed relationship actually existed, or even that the juror was aware of the alleged relationship between the prosecutor and Orlando Velasquez, the district clerk. Nor does the record show that defense counsel asked sufficiently specific questions designed to assist the juror in identifying the alleged relationship. See *id*.

Instead, the motion relied primarily on the juror's silence during voir dire and attached only a photograph, a gift deed, and a brochure. Those exhibits do not establish juror misconduct or demonstrate the existence of a material undisclosed relationship. The attached exhibits do not establish misconduct.

Under *Najar*, the trial court is the exclusive judge of the credibility of evidence offered in support of a motion for new trial, and it is not required to believe any factual assertion unless it is conclusively established. *Najar*, 618 S.W.3d at 372. Allegations in a motion—unsupported by sworn testimony—are not evidence. And because juror-misconduct claims under Rule 21.3(f) must be proven by competent evidence, the failure to attach affidavits within the 30-day deadline means the movant has not met the burden to show that misconduct occurred, that it was material, or that it probably caused injury.

Accordingly, the motion's assertion that the juror "withheld" information is unsupported by any evidence the trial court was required to credit. Given the absence of affidavits and the nature of the allegations, the trial court acted well within its discretion in denying the motion for new trial.

The motion further alleged that the same juror engaged in misconduct the day after both sides rested by appearing at a municipal election site in the presence of the district clerk, who is the prosecutor's fiancé. The motion attached a photograph from Facebook purporting to show the juror, district clerk and at least thirteen other individuals in the frame. But, as with the first allegation, the motion was filed without any supporting affidavits. No affidavit from the juror, the district clerk, counsel, or any witness was offered to explain the circumstances of the photograph, to establish that any communication occurred, or to show that the juror violated the court's admonishments under Article 36.22.

A Facebook photograph, standing alone, does not establish juror misconduct. *Elston v. Sherman Coca–Cola & Dr. Pepper Co.*, 596 S.W.2d at 217; see also *Mem'l Park Med. Ctr., Inc. v. Bob Thornhill Trucking*, No. 11-24-00064-CV, 2026 WL 191948, at *3. (The purpose of the affidavit requirement is to support the allegations by competent proof). It does not show that the

juror and the district clerk spoke, discussed the case, or had any interaction prohibited by Rule 21.3(f). And under *Najar* the trial court is not required to accept any factual assertion unless it is conclusively established, for example, by stipulation or indisputable visual evidence. *Najar*, 618 S.W.3d at 372. The photograph here is not "indisputable visual evidence" of misconduct; at most, it shows fifteen individuals in a photograph, which is susceptible to multiple plausible interpretations. When the evidence supports more than one reasonable view, it lies within the trial court's exclusive purview to decide which interpretation to believe. *Id.* (citing *Evans*, 202 S.W.3d at 165).

Moreover, juror-misconduct claims under Rule 21.3(f) require proof that the jury actually received outside evidence, engaged in prohibited communication, or became intoxicated in a way that probably affected the verdict. *Najar*, 618 S.W.3d at 374. The motion's allegation—that the juror was merely present at the same polling site as the district clerk—does not establish any of these statutory grounds. Without affidavits or competent evidence showing that prohibited communication occurred, the trial court was free to disbelieve the unsworn assertions in the motion.

Accordingly, because the motion for new trial presented no competent evidence of misconduct, the trial court did not abuse its discretion in denying relief. As such, we overrule Gazca's second point of error.

## CONCLUSION

Gazca's challenge to the admission of the State's crime-scene reconstruction expert was not preserved. His objections at trial concerned only the expert's qualifications, and under *Null*, an unpreserved reliability complaint presents nothing for review. His motion for new trial, likewise, did not establish reversible error. The juror misconduct allegations were unsupported by affidavits

or other competent evidence, and the attached exhibits did not demonstrate a violation of Rule 21.3(f). Under *Najar*, the trial court was not required to credit unsworn assertions.

Having overruled both issues, we affirm the trial court's judgment.

Velia J. Meza, Justice

PUBLISH